# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 22, 2019                    Decided April 1, 2019

No. 19-5042

DAMIEN GUEDES, ET AL.,
APPELLANTS

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,
ET AL.,
APPELLEES

———

Consolidated with 19-5044

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-02988)
(No. 1:18-cv-03086)

———

*Erik S. Jaffe* argued the cause for appellants Damien Guedes, *et al.* With him on the briefs were *Joshua Prince* and *Adam Kraut*.

*Stephen D. Stamboulieh* and *Alan Alexander Beck* were on the brief for appellants David Codrea, *et al*.

*Ilya Shapiro* was on the brief for *amicus curiae* Cato Institute in support of appellants.

*Conor Shaw* and *Nikhel S. Sus* were on the brief for *amici curiae* Citizens for Responsibility and Ethics in Washington and Former Government and Ethics Officials in support of appellants.

*Steven M. Simpson* was on the brief for *amici curiae* The New Civil Liberties Alliance and W. Clark Aposhian in support of appellants.

*J. Carl Cecere, Jr.* was on the brief for *amicus curiae* Morton Rosenberg in support of reversal.

*Bradley Hinshelwood*, Attorney, and *Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the causes for appellees. With them on the brief were *Matthew J. Glover*, Counsel to the Assistant Attorney General, and *Scott R. McIntosh*, *Michael S. Raab*, and *Abby C. Wright*, Attorneys.

*Ian Simmons*, *Matt Schock*, and *Anthony G. Beasley* were on the brief for *amicus curiae* Giffords Law Center to Prevent Gun Violence in support of appellees.

Before: HENDERSON, SRINIVASAN and MILLETT, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

PER CURIAM: In October 2017, a lone gunman armed with bump-stock-enhanced semiautomatic weapons murdered 58 people and wounded hundreds more in a mass shooting at a concert in Las Vegas, Nevada. In the wake of that tragedy, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("Bureau") promulgated through formal notice-and-comment proceedings a rule that classifies bump-stock devices as machine guns under the National Firearms Act, 26 U.S.C. §§ 5801–5872. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018) ("Bump-Stock Rule"). The then-Acting Attorney General Matthew Whitaker initially signed the final Bump-Stock Rule, and Attorney General William Barr independently ratified it shortly after taking office. Bump-stock owners and advocates filed separate lawsuits in the United States District Court for the District of Columbia to prevent the Rule from taking effect. The district court denied the plaintiffs' motions for a preliminary injunction to halt the Rule's effective date. *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109 (D.D.C. 2019). We affirm the denial of preliminary injunctive relief.

**I**

**A**

The National Firearms Act (i) regulates the production, dealing in, possession, transfer, import, and export of covered firearms; (ii) creates a national firearms registry; and (iii) imposes taxes on firearms importers, manufacturers, and dealers, as well as specified transfers of covered firearms. 26 U.S.C. §§ 5801–5861. Failure to comply with the National Firearms Act's requirements results in penalties and forfeiture, and subjects the violator to the general enforcement measures available under the internal revenue laws. *Id*. §§ 5871–5872.

4

The firearms subject to regulation and registration under the National Firearms Act include "machinegun[s]." 26 U.S.C. § 5845(a).[1]   The statute defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The definition also covers "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination of parts from which a machinegun can be assembled" as long as those "parts are in the possession or under the control of a person."  *Id*.

Congress expressly charged the Attorney General with the "administration and enforcement" of the National Firearms Act, 26 U.S.C. § 7801(a)(1), (a)(2)(A), and provided that the Attorney General "shall prescribe all needful rules and regulations for the enforcement of" the Act," *id*. § 7805; *see id*. § 7801(a)(2)(A).

The Gun Control Act of 1968, 18 U.S.C. § 921 *et seq*., as amended by the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), imposes both a regulatory licensing scheme and criminal prohibitions on specified firearms transactions.  *See* 18 U.S.C. § 923 (licensing scheme); *id*. § 922 (criminal prohibitions).  The Gun Control Act incorporates by reference the definition of machine gun in the National Firearms Act, 26 U.S.C. § 5845(b).  *See* 18 U.S.C. § 921(a)(23).  The Gun Control Act also expressly delegates administrative and rulemaking authority to the Attorney General to "prescribe only such rules and regulations as are

---

[1] Except when quoting sources, we use the two-word spelling of machine gun.

necessary to carry out the provisions of this chapter." *Id*. § 926(a).

The Attorney General has delegated the responsibility for administering and enforcing the National Firearms Act and the Gun Control Act to the Bureau. *See* 28 C.F.R. § 0.130(a).

**B**

**1**

Machine guns are generally prohibited by federal law. *See* 18 U.S.C. § 922(o). On the other hand, many firearms that require a distinct pull of the trigger to shoot each bullet are lawful. *See generally id.* § 922; 26 U.S.C. § 5845.

A "bump stock" is a device that replaces the standard stationary stock of a semiautomatic rifle—the part of the rifle that typically rests against the shooter's shoulder—with a non-stationary, sliding stock that allows the shooter to rapidly increase the rate of fire, approximating that of an automatic weapon. 83 Fed. Reg. at 66,516. A bump stock does so by channeling and directing the recoil energy from each shot "into the space created by the sliding stock (approximately 1.5 inches) in constrained linear rearward and forward paths." *Id*. at 66,518. In so doing, the bump stock "harnesses the firearm's recoil energy as part of a continuous back-and-forth cycle that allows the shooter to attain continuous firing" following a single pull of the trigger. *Id.* at 66,533. That design allows the shooter, by maintaining constant backward pressure on the trigger as well as forward pressure on the front of the gun, to fire bullets continuously and at a high rate of fire to "mimic" the performance of a fully automatic weapon. *Id*. at 66,516.

Exercising his regulatory authority, the Attorney General first included a bump-stock type device within the statutory definition of "machinegun" in 2006. *See* ATF Ruling 2006-2; *see also Akins v. United States*, 312 F. App'x 197, 199 (11th Cir. 2009) (summary order). In later years, some other bump-stock devices were not categorized as machine guns. 83 Fed. Reg. at 66,514.

**2**

On October 1, 2017, a shooter used multiple semiautomatic rifles equipped with bump stocks to fire several hundred rounds of ammunition into a crowd of concert attendees within a roughly ten-minute span of time. The "'rapid fire' operation" of the shooter's weapons enabled by the bump stocks left 58 dead and approximately 500 wounded. 83 Fed. Reg. at 66,516.

The Las Vegas massacre prompted an immediate outcry from the public and members of Congress. *See Guedes*, 356 F. Supp. 3d at 120, 123. In response, President Trump "direct[ed] the Department of Justice, * * * as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 83 Fed. Reg. 7,949, 7,949 (Feb. 20, 2018). The Bureau then revisited the status of bump stocks and addressed the variation in its prior positions. 83 Fed. Reg. at 66,516–66,517. On March 29, 2018, then-Attorney General Sessions issued a Notice of Proposed Rulemaking that suggested "amend[ing] the Bureau of Alcohol, Tobacco, Firearms, and Explosives regulations to clarify that [bump-stock-type devices] are 'machineguns'" under 26 U.S.C. § 5845(b). *See* Bump-Stock-Type Devices, 83 Fed. Reg. 13,442 (March 29, 2018).

The Bureau promulgated its final rule on December 26, 2018. With respect to the statutory definition of machine gun, the Bump-Stock Rule provided that the National Firearms Act's use of "the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,'" 26 U.S.C. § 5845(b), "means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." 83 Fed. Reg. at 66,553–66,554 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11). The Rule further defined "single function of the trigger," 26 U.S.C. § 5845(b), to mean "a single pull of the trigger and analogous motions." 83 Fed. Reg. at 66,553–66,554 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11).

In light of those definitions, the Bump-Stock Rule concluded that the statutory term "'machinegun' includes a bump-stock-type device"—that is, "a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." 83 Fed. Reg. at 66,553–66,554 (codified at 27 C.F.R. §§ 447.11, 478.11, 479.11).

In adopting the Bump-Stock Rule, the Bureau relied on both the "plain meaning" of the statute and the agency's charge to implement the National Firearms Act and the Gun Control Act. 83 Fed. Reg. at 66,527 (citing and invoking *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). The Bureau explained that the Bump-Stock Rule both "accord[s] with the plain meaning" of the statute, and "rests on a reasonable construction of" any "ambiguous" statutory terms. *Id.* In the Bureau's view, by not further defining the terms "automatically" and "single function of the trigger," Congress

"left it to the [Attorney General] to define [them] in the event those terms are ambiguous." *Id*. (citing *Chevron*, 467 U.S. at 844); *see also id*. at 66,515 (citing delegations of regulatory authority under 26 U.S.C. §§ 7801(a)(2)(A), 7805(a), and 18 U.S.C. § 926(a)).

The Bureau was explicit that the Bump-Stock Rule would only become "effective" on March 26, 2019, ninety days after promulgation. 83 Fed. Reg. at 66,514. The Bureau further assured that individuals would be subject to "criminal liability only for possessing bump-stock-type devices *after* the effective date of regulation, not for possession before that date." *Id*. at 66,525; *see also id*. (providing that the Rule "criminalize[s] only future conduct, not past possession of bump-stock-type devices that ceases by the effective date"); *id*. at 66,539 ("To the extent that owners timely destroy or abandon these bump-stock-type devices, they will not be in violation of the law[.]"). Bump-stock owners were directed to destroy their devices or leave them at a Bureau office by March 26, 2019. *Id.* at 66,514.

Although most of the rulemaking process occurred during the tenure of Attorney General Jefferson Sessions, he resigned his office on November 7, 2018. The President then invoked the Federal Vacancies Reform Act of 1998 ("Reform Act"), 5 U.S.C. § 3345(a)(3), to designate Matthew Whitaker, who had been Sessions' chief of staff, "to perform the functions and duties of the office of Attorney General, until the position is filled by appointment or subsequent designation." Memorandum from President Donald Trump to Matthew George Whitaker, Chief of Staff, Department of Justice (Nov. 8, 2018), J.A. 277. The final Bump-Stock Rule was signed by then-Acting Attorney General Whitaker. Whitaker served as the Acting Attorney General for 98 days, until William Barr was sworn in as the Attorney General on February 14, 2019.

*See* Bump-Stock-Type Devices, 84 Fed. Reg. 9,239, 9,240 (March 14, 2019).

On March 11, 2019, Attorney General Barr announced that he had "independently reevaluate[d]" the Bump-Stock Rule and the "underlying rulemaking record." 94 Fed. Reg. at 9,240. "[H]aving reevaluated those materials without any deference to [Whitaker's] earlier decision," Attorney General Barr "personally c[a]me to the conclusion that it is appropriate to ratify and affirm the final rule," and did so. *Id.*

**C**

Three groups of bump-stock owners and advocates filed suit in the United States District Court for the District of Columbia to prevent the Bump-Stock Rule from taking effect. *See Damien Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 18-cv-2988; *David Codrea v. William P. Barr*, No. 18-cv-3086; *Firearms Policy Coalition, Inc. v. William P. Barr*, No. 18-cv-3083. As relevant here, the Guedes plaintiffs ("Guedes") and the Codrea plaintiffs ("Codrea") argued that the Bureau promulgated the Bump-Stock Rule in violation of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. Also, the Firearms Policy Coalition ("Coalition") and Codrea argued that Acting Attorney General Whitaker lacked the legal authority to promulgate the Rule because his designation as Acting Attorney General violated the Attorney General Act, 28 U.S.C. § 508, and the Appointments Clause of the Constitution, Article II, Section 2, Clause 2.

The district court denied all three motions for a preliminary injunction. *Guedes*, 356 F. Supp. 3d at 119. The district court concluded that Guedes, Codrea, and the Coalition had not demonstrated a likelihood of success on the merits. The court first held that "[m]ost of the plaintiffs' administrative

law challenges are foreclosed by the *Chevron* doctrine," and the Rule "adequately explained" the agency's decision to classify bump-stock-type devices as machine guns. *Id*. at 120. As to the challenges to Whitaker's authority, the district court held that the Reform Act permits the President to deviate from the line of succession that the Attorney General Act provides, subject to certain statutory limitations that indisputably were satisfied with Whitaker's appointment. *Guedes*, 356 F. Supp. 3d at 120–121. The court also rejected the Coalition's and Codrea's Appointments Clause challenge as "foreclosed by Supreme Court precedent and historical practice." *Id*. at 121.

Guedes, Codrea, and the Coalition all appealed. But none of them sought a stay or an injunction pending appeal. They chose instead to seek highly expedited disposition, which this court granted. While the appeal was pending, Attorney General Barr ratified and individually endorsed the final Bump-Stock Rule. At the post-argument request of the Coalition, we voluntarily dismissed its appeal. Order, *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 19-5042 (March 23, 2019) (per curiam). But because Codrea presses the same challenge to Whitaker's authority to promulgate the Rule as the Coalition had raised, Codrea Br. 20–21, that issue remains before us in reviewing the district court's denial of a preliminary injunction.

## II

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The plaintiffs bear the burden of persuasion in seeking preliminary relief. *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). Specifically, Guedes and Codrea must establish that: (1) they are "likely to succeed on

the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities" tips in their favor; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *accord Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

We review a district court's denial of a preliminary injunction for an abuse of discretion, but in doing so we review the district court's legal conclusions *de novo* and any findings of fact for clear error. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

**III**

A foundational requirement for obtaining preliminary injunctive relief is that the plaintiffs demonstrate a likelihood of success on the merits. *See Nken*, 556 U.S. at 434 ("The first two factors of the traditional standard [*i.e.*, likelihood of success on the merits and irreparable injury] are the most critical."); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (raising the possibility that "likelihood of success is an independent, free-standing requirement for a preliminary injunction") (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

Neither the challenge to Acting Attorney General Whitaker's authority nor the objections to the substantive validity of the Bump-Stock Rule clears that hurdle. And because the plaintiffs have shown no likelihood of success on the merits, we choose not to "proceed to review the other three preliminary injunction factors." *Arkansas Dairy Coop. Ass'n*

*v. United States Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

**A**

Codrea levels a broadside attack on the rule as categorically invalid because Acting Attorney General Whitaker allegedly lacked the legal authority to approve the Bump-Stock Rule's issuance. Specifically, Codrea argues that Whitaker's designation to serve as Acting Attorney General violated both the Attorney General Act, 28 U.S.C. § 508, and the Constitution's Appointments Clause, U.S. Const. Art. II, § 2, cl. 2. Whether or not those arguments would otherwise have had merit (something we do not decide), Codrea has no likelihood of success on this claim because the rule has been independently ratified by Attorney General William Barr, whose valid appointment and authority to ratify is unquestioned.

The Appointments Clause requires that "all * * * Officers of the United States" be appointed by the President "by and with the Advice and Consent of the Senate." U.S. Const. Art. II, § 2, cl. 2. This requirement is the "default manner of appointment," *Edmond v. United States*, 520 U.S. 651, 660 (1997), with the only exception being that Congress may vest the appointment of "inferior Officers" in "the President alone," "Courts of Law," and "the Heads of Departments," U.S. Const. Art. II, § 2, cl. 2 .

One stark consequence of this scheme is that "the responsibilities of an office * * * [can] go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement." *National Labor Relations Bd. v. SW Gen., Inc.*, 137 S. Ct. 929, 934 (2017); *Buckley v. Valeo,* 424 U.S. 1, 132 (1976) (per curiam) ("[A]ll officers of the United States are to be appointed in accordance with the Clause.").

"Since the beginning of the nation," Congress has addressed this problem through "vacancy statutes" that grant the President the authority to designate acting officials to "keep the federal bureaucracy humming." *SW General, Inc. v. National Labor Relations Bd.*, 796 F.3d 67, 70 (D.C. Cir. 2015) (quotation marks omitted), *aff'd*, 137 S. Ct. 929 (2017).

The Reform Act is the most recent iteration of that interbranch accommodation. It provides for three options whenever a Senate-confirmed officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office[.]" 5 U.S.C. § 3345(a). The default is for the "first assistant" to take the helm. *Id*. § 3345(a)(1). But the Reform Act allows the President to choose another person instead, as long as that person is either a Senate-confirmed appointee, *id*. § 3345(a)(2), or an employee within the same agency, subject to certain duration-of-service and pay-scale requirements, *id*. § 3345(a)(3). Mr. Whitaker was designated under the latter option, since his service as chief of staff comported with the Reform Act's duration-of-service and pay grade requirements. *Guedes*, 356 F. Supp. 3d at 138 ("The parties do not dispute that Whitaker satisfies the eligibility criteria in the [Reform Act.]").

Congress broadly designated the Reform Act to be the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" Executive office that would otherwise require Senate confirmation. 5 U.S.C. § 3347(a). But there is an "unless"—Congress crafted exceptions to that exclusivity. *Id*. As relevant here, Section 3347(a) does not control if another "statutory provision expressly * * * designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity[.]" *Id*. § 3347(a)(1)(B).

The Attorney General Act, 28 U.S.C. § 508, is one of those office-specific vacancy statutes. That statute specifies a line of succession for a vacancy in the Office of the Attorney General. First in line is the Deputy Attorney General, who "may exercise all the duties of th[e] office" and who, "for the purpose of section 3345 of [the Reform Act]," is deemed "the first assistant to the Attorney General." 28 U.S.C. § 508(a). If the Deputy Attorney General is unavailable, the Attorney General Act directs that "the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General." *Id.* § 508(b).

Codrea and the Department have battled at length over the interaction between the Reform Act and the Attorney General Act in the event of a vacancy in the position of the Attorney General. The Government maintains, and the district court agreed, that the two statutes provide the President with alternative means of designating an acting replacement. *Guedes*, 356 F. Supp. 3d at 139; Gov't Br. 40–58. Codrea, by comparison, reads the Attorney General Act as the exclusive path for designating an acting Attorney General, with the Reform Act available only after the line of succession in the Attorney General Act has been exhausted. Codrea Br. 20–21 (incorporating Coalition Br. 6). Codrea also argues that the designation of a mere employee to perform the duties of a principal office like that of the Attorney General, even on an acting basis, raises substantial constitutional questions, at least when no exigency requires that designation. *Id.* (adopting Coalition Reply Br. 15).

We need not wade into that thicket. While this appeal was pending, Attorney General Barr independently "familiarized [him]self with the rulemaking record [and] * * * reevaluated those materials without any deference to [Whitaker's] earlier

decision." 84 Fed. Reg. at 9,240. Following this "independent[] reevaluat[ion] [of] the * * * rule and the underlying rulemaking record," Attorney General Barr "personally c[a]me to the conclusion that it [wa]s appropriate to ratify and affirm the final rule." *Id.*

Codrea accepts the validity of Attorney General Barr's ratification as to both his statutory and his Appointments Clause claims. Codrea Br. 20–21 (adopting Coalition Reply Br. 22). *See also* 5 U.S.C. § 3348(d)(1)–(2) (only prohibiting the ratification of nondelegable duties); 28 U.S.C. § 510 (authorizing delegation of "any function of the Attorney General"). And with that act of ratification and the concession, Codrea's likelihood of success on the merits of his challenge to the rule based on Acting Attorney General Whitaker's role in its promulgation reduces to zero.

Codrea insists otherwise. He argues that Attorney General Barr's ratification does not moot the claim because of the mootness doctrine's exceptions for a defendant's voluntary cessation of challenged conduct or for acts capable of repetition yet evading review. Codrea Br. 20–21 (adopting Coalition Reply Br. 17). That argument fails because ratification is generally treated as a disposition on the legal merits of the appointments challenge and, in any event, no mootness exception applies in this case.

**1**

The mootness doctrine "ensures compliance with Article III's case and controversy requirement by 'limit[ing] federal courts to deciding actual, ongoing controversies.'" *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016) (quoting *American Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011)). A case is moot if our decision will neither "presently affect the parties' rights nor have a more-than-speculative chance of affecting

them in the future." *Id.* (internal quotation marks omitted) (quoting *American Bar Ass'n*, 636 F.3d at 645).

We have repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting a claim, resolves the claim on the merits by "remedy[ing] [the] defect" (if any) from the initial appointment. *Wilkes-Barre Hosp. Co. v. National Labor Relations Bd.*, 857 F.3d 364, 371 (D.C. Cir. 2017). This is so regardless of whether "the previous [officer] was" or was not "validly appointed under either the Vacancies Act or the Appointments Clause." *Intercollegiate Broad. Sys. Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 119 n.3 (D.C. Cir. 2015) (ratification defeats Appointments Clause challenge) (citing *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 205, 207, 212–214 (D.C. Cir. 1998), *superseded by statute on other grounds*, Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 122 Stat. 2681, *as recognized in SW Gen., Inc.*, 796 F.3d at 70–71); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 706, 708–710 (D.C. Cir. 1996) (similar).

In *Doolin*, we treated the curative effects of ratification as analogous to rendering any defect in the agency's action "harmless error" under the Administrative Procedure Act, 5 U.S.C. § 706. 139 F.3d at 212. So viewed, ratification purges any residual taint or prejudice left over from the allegedly invalid appointment. *Legi-Tech,* 75 F.3d at 708 n.5 ("[T]he issue is not whether *Legi-Tech* was prejudiced by the original [decision], which it undoubtedly was, but whether, given the FEC's remedial actions, there is sufficient remaining prejudice to warrant dismissal."); *Intercollegiate Broad.*, 796 F.3d at 124 (citing *Legi-Tech* for the same proposition). When viewed as analogous to harmless-error analysis, ratification is treated as resolving the merits of the challenger's claim in the agency's favor. *Cf. Doolin*, 139 F.3d at 212; *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir.

2015) (rejecting a procedural challenge to a Federal Election Commission fine on the merits because the alleged infirmity produced no "prejudice").

Those cases' treatment of ratification as resolving the merits of a claimed appointment flaw parallels how this court analyzes the agency practice of post-promulgation notice and comment. When an agency "issues final regulations without the requisite comment period and then tries to *cure* that Administrative Procedure Act violation by holding a post-promulgation comment period," we have repeatedly held that the agency prevails on the merits as long as it can demonstrate that it has kept an "open mind" throughout the subsequent comment period. *See*, *e.g.*, *Intermountain Ins. Serv. of Vail v. Commissioner,* 650 F.3d 691, 709 (D.C. Cir. 2011) (emphasis added), *vacated and remanded on other grounds*, 566 U.S. 972 (2012), *dismissed on unopposed motion*, No. 10-1204, 2012 WL 2371486, at *1 (D.C. Cir. June 11, 2012); *Advocates for Highway & Auto Safety v. Federal Highway Admin.,* 28 F.3d 1288, 1291–1293 (D.C. Cir. 1994) (same).

Codrea points to *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000), in which this court resolved the merits of an Appointments Clause challenge to an administrative law judge's decision, notwithstanding the subsequent *de novo* review and affirmance of that decision by the agency itself, *id.* at 1131. That case is of no help to Codrea. *Landry* carved out a narrow exception to ratification's curative effect for Appointments Clause challenges to the acts of "purely decision recommending employees." *Id.* at 1131–1132. This court explained that, if ratification were an escape hatch in those cases, "then all such arrangements would escape judicial review" because the challenged ALJ action would never obtain judicial review without first exhausting that ratifying internal agency review process. *Id.* Only when that particular "catch-22" is present does the *Landry* approach apply. *Id.*; *accord*

*Intercollegiate Broad.*, 796 F.3d at 124 (distinguishing *Landry* on that basis). The succession of a Presidentially appointed and Senate-confirmed Attorney General does not remotely implicate the *Landry* scenario.

**2**

Codrea argues that we should analyze the effect of ratification through the lens of mootness rather than treating ratification as resolving the case on the merits. Codrea Br. 20–21 (adopting Coalition Reply Br. 16–17).

Codrea notes that all of our prior ratification cases dealt with appointments challenges that arose as defenses to enforcement actions that were being prosecuted by a properly appointed official, but that were allegedly "tainted" by some preceding action of an unlawfully appointed official. Codrea Br. 20–21 (adopting Coalition Reply Br. 20). *See, e.g.*, *Intercollegiate Broad.*, 796 F.3d at 124 (raising Appointments Clause defense in a "subsequent proceeding" based on the "continuing taint arising from the first" proceeding); *Doolin*, 139 F.3d at 212 (raising Appointments Clause challenge to officer who issued the initial "Notice of Charges" to collaterally attack the ultimate cease-and-desist order issued by a validly appointed officer).

In that scenario, Codrea reasons, the appointment issue arose only as an affirmative defense; no act intervened during litigation to eliminate the factual basis for an affirmative claim for relief in a way that generally would trigger mootness analysis. Here, by contrast, Codrea has raised as a plaintiff an independent, pre-enforcement challenge to an agency rule in an attempt to avert a present duty to comply, and he filed suit at a time when the allegedly improperly appointed official was still in office and enforcing his own challenged decision. For that reason, the effect of Attorney General Barr's intervening ratification must be guided not by a merits analysis, but rather

by mootness. Codrea Br. 20–21 (adopting Coalition Reply Br. 17); *see, e.g.*, *EEOC v. First Citizens Bank of Billings*, 758 F.2d 397, 399–400 (9th Cir. 1985) (treating congressional ratification as causing mootness); *see also Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 506 (D.C. Cir. 1999) (assuming that congressional ratification mooted an unauthorized-tax claim).

The problem for Codrea is that, even if we were to adopt his proposed analytical approach, his claim still lacks any discernible likelihood of success on the merits because no exception to mootness fits this scenario.

*First*, this case does not implicate the exception to mootness for cases that are "capable of repetition, yet evading review." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018). For a controversy to be "capable of repetition," Codrea bears the burden of showing that (i) the challenged action is "in its duration too short to be fully litigated prior to its cessation or expiration," and (ii) there is a "reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. FEC*, 554 U.S. 724, 735 (2008) (citations omitted); *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n,* 628 F.3d 568, 576 (D.C. Cir. 2010) (party asserting capable of repetition bears burden of proof) (citing *Southern Co. Servs., Inc. v. FERC*, 416 F.3d 39, 43 (D.C. Cir. 2005)). Under that test, "[t]he 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the *precise controversy it spawns*." *People for Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416, 422–423 (D.C. Cir. 2005) (emphasis added). This demand for particularity ensures "that courts resolve only continuing controversies between the parties." *Id.*

Here, Codrea has wholly failed to show that appointments claims like his are too short-fused to obtain judicial resolution,

or that there is anything more than the most remote and "theoretical[ ] possib[ility]" of repetition. *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). For Codrea's legal injury to recur, (i) the Attorney General would have to leave office; (ii) the President would then have to appoint a mere employee in his stead (something Codrea argues has not happened more than a "handful" of times in history (Codrea Br. 20-21 (adopting Coalition Br. 38; Coalition Reply Br. 15–16)); (iii) that the new Acting Attorney General would then have to promulgate a legislative rule; and (iv) by sheer coincidence, that rule would have to adversely affect Codrea or his co-plaintiffs' legal rights. It takes more than such quixotic speculation to save a case from mootness, even when the Executive continues to defend its prerogatives in litigation. *See Larsen v. United States Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008).

*Second*, Codrea's invocation of the rule that a defendant's voluntary cessation of challenged activity will not moot a case fares no better. *See Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 189 (2000). The voluntary-cessation rule is designed to deter the wrongdoer who would otherwise "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). For that reason, a party's voluntary cessation of challenged conduct will not moot a case unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw Environmental Servs.*, 528 U.S. at 189 (internal quotation marks omitted).[2]

---

[2] It bears noting that the merits-based analysis of prejudice that Codrea seeks to avoid includes a somewhat analogous exception for a defendant's strategic manipulation of the process to avoid judicial

The voluntary-cessation doctrine has no apparent relevance here. That is because the power to effect the legally relevant ratification by a duly installed Attorney General—the supposed source of "cessation"—lies beyond the unilateral legal authority of any of the named defendants, the Office of the Attorney General, or even the President of the United States. Under the peculiar circumstances of this case, where the ratification was a result of the combined actions of a presidential nomination and an independent Senate confirmation, the "voluntariness" in "voluntary cessation" is not implicated.

Aimed as it is at party manipulation of the judicial process through the false pretense of singlehandedly ending a dispute, the voluntary-cessation exception presupposes that the infringing party voluntarily exercises its own unilateral power not only to terminate the suit and evade judicial review, but also to "pick up where he left off" and complete the devious "cycle" after the litigation is dismissed. *Already, LLC*, 568 U.S. at 91; *see City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (explaining that the "rule traces to the principle that *a party* should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior") (emphasis added); *Knox v. Service Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (voluntary cessation concerns a defendant's "*resumption* of * * * challenged conduct as soon as the case is dismissed")

review. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[I]f the government could skip [the APA's rulemaking] procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not [already] presented informally," then the APA's prescribed rulemaking process "obviously would be eviscerated.").

(emphasis added); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (voluntary-cessation doctrine rooted in concern over leaving a "defendant * * * free to return to his old ways").

That framework ill fits a situation where, as here, the intervening acts of independent third parties are essential to accomplish a legally relevant change in circumstances. Here, ratification materially changed the circumstances of the litigation only because it was undertaken by a validly appointed Attorney General whose authority to act Codrea does not challenge. Codrea Br. 20–21 (adopting Coalition Reply Br. 22) ("Plaintiff assumes that the ratification was not tainted by Mr. Whitaker's actions in promulgating the Rule in the first place."). That "cessation" of the legal challenge was outside the hands of the named defendants—then-Acting Attorney General Whitaker, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Acting Bureau Director Thomas Brandon, and Attorney General William Barr. The essential predicate for that legally relevant form of cessation was the (non-defendant) President's nomination and the (non-defendant) Senate's independent confirmation of a new Attorney General, and their endowment of him with the authority to "cease" the litigation by way of ratification.

In other words, the defendants in this case lacked the unilateral power, or the power at all, to voluntarily cease and restart the conduct complained of—having a Reform-Act-appointed Acting Attorney General promulgate or enforce a rule adversely affecting Guedes and Codrea. Without such power, the risk of manipulating the litigation process evaporates. In addition, the deliberative burdens of the Senate's intervening and independent advice-and-consent role extinguish the strategic concerns animating the voluntary-cessation doctrine in the first place. *Cf. Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc) (raising "serious

doubts" about "applying the doctrine to Congress" because, "in the absence of overwhelming evidence (and perhaps not then), it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose"); *United States Dep't of the Treasury v. Galioto*, 477 U.S. 556, 560 (1986) (analyzing the mooting effects of Congressional amendment without reference to voluntary cessation). At the very least, Codrea has a vanishingly low likelihood of prevailing on that theory.[3]

In sum, because Codrea has shown no likelihood of success on his appointment-based challenges due to Attorney General Barr's independent and unchallenged ratification of the Bump-Stock Rule, the district court did not abuse its discretion in denying a preliminary injunction based on those statutory and constitutional claims.

---

[3] This case does not present, and we need not decide, whether the President's unilateral designation of a different *acting* Attorney General would have implicated the voluntary-cessation doctrine. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (no mootness when Governor ordered state Department of Natural Resources to rescind challenged policy, where there was no evidence the Department "could not revert to its policy of excluding religious organizations"); *cf. Doe v. Harris*, 696 F.2d 109, 113 (D.C. Cir. 1982) (applying the capable of repetition doctrine to "different official actors" within the same U.S. Attorney's Office). What matters in this case is not that the Bump-Stock Rule was ratified by someone other than Acting Attorney General Whitaker, but that it was ratified by someone whose authority to undertake such a ratification—by virtue of Presidential nomination and Senate confirmation—Codrea admits he cannot challenge.

**B**

We next consider the plaintiffs' contention that the Bureau lacked statutory authority to promulgate the Bump-Stock Rule. Specifically, Guedes and Codrea argue that the statutory definition of "machinegun" cannot be read to include bump-stock devices. Guedes and Codrea have not demonstrated a substantial likelihood of success on that claim.

**1**

At the outset, we must determine the standard by which to assess the Rule's conclusion that bump-stock devices amount to "machineguns" under the statutory definition. In particular, should we examine the Rule's conclusion to that effect under the *Chevron* framework, or is *Chevron* inapplicable?

If *Chevron* treatment is in order, we first ask if the statute is ambiguous concerning whether bump-stock devices can be considered "machineguns"; and if so, we sustain the Rule's conclusion that bump-stock devices are machine guns as long as it is reasonable. *See*, *e.g.*, *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Crucially, at this second step under *Chevron*, an "agency need not adopt * * * the best reading of the statute, but merely one that is permissible." *Dada v. Mukasey*, 554 U.S. 1, 29 n.1 (2008). Conversely, if *Chevron*'s two-step framework is inapplicable, we accept the agency's interpretation only if it is the best reading of the statute.

Much, then, can turn on whether an agency's interpretation merits treatment under *Chevron*. For that reason, and because none of the parties presents an argument for applying the *Chevron* framework (the plaintiffs contend that *Chevron* is inapplicable and the government does not argue otherwise), we devote considerable attention to the question of *Chevron*'s

applicability to the Bump-Stock Rule. We conclude that the Rule warrants consideration under *Chevron*.

**a**

The applicability of *Chevron* materially depends on what kind of rule the Bump-Stock Rule represents. There is a "central distinction" under the Administrative Procedure Act between legislative rules and interpretive rules. *Chrysler Corp v. Brown*, 441 U.S. 281, 301 (1979); *see* 5 U.S.C. § 553(b), (d). And that distinction centrally informs the applicability of *Chevron*. "Legislative rules generally receive *Chevron* deference," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014), whereas "interpretive rules * * * enjoy no *Chevron* status as a class," *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001); *see also Nat'l Mining Ass'n*, 758 F.3d at 251 (observing that interpretive rules "often do not" receive *Chevron* deference).

Legislative rules result from an agency's exercise of "delegated legislative power" from Congress. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Accordingly, legislative rules have the "force and effect of law." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2122 (2016). Interpretive rules, on the other hand, are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). Because they are not an exercise of delegated legislative authority, interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* While legislative rules generally require notice and comment, interpretive rules need not issue pursuant to any formalized procedures. *See* 5 U.S.C. § 553(b).

26

To determine whether a rule is legislative or interpretive, we ask whether the agency "intended" to speak with the force of law. *Encino Motorcars*, 136 S. Ct. at 2122; *Am. Mining Cong.*, 995 F.2d at 1109. Central to the analysis is the "language actually used by the agency." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). We also consider "whether the agency has published the rule in the Code of Federal Regulations" and "whether the agency has explicitly invoked its general legislative authority." *Am. Mining Cong.*, 995 F.2d at 1112.

All pertinent indicia of agency intent confirm that the Bump-Stock Rule is a legislative rule. The Rule unequivocally bespeaks an effort by the Bureau to adjust the legal rights and obligations of bump-stock owners—i.e., to act with the force of law. The Rule makes clear throughout that possession of bump-stock devices will become unlawful only as of the Rule's effective date, not before.

To that end, the Rule informs bump-stock owners that their devices "*will be prohibited when* this rule becomes effective." 83 Fed. Reg. at 66,514 (emphasis added). It correspondingly assures bump-stock owners that "[a]nyone currently in possession of a bump-stock-type device *is not acting unlawfully unless* they fail to relinquish or destroy their device after the effective date of this regulation." *Id.* at 66,523 (emphasis added). And the Rule "provides specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished *to avoid violating 18 U.S.C. § 922(o)*." *Id.* at 66,530 (emphasis added). Reinforcing the point, the Rule says it will "*criminalize only future conduct, not past possession* of bump-stock-type devices that ceases by the effective date." *Id.* at 66,525 (emphasis added).

Those statements, and others like them in the Rule, embody an effort to "directly govern[] the conduct of members of the public, affecting individual rights and obligations." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007) (internal quotation marks omitted). That is powerful evidence that the Bureau "intended [the Rule] as a binding application of its rulemaking authority." *Id.*

The Bureau further evinced its intent to exercise legislative authority by expressly invoking the *Chevron* framework and then elaborating at length as to how *Chevron* applies to the Rule. The Rule observes that, "[w]hen a court is called upon to review an agency's construction of the statute it administers, the court looks to the framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*" 83 Fed. Reg. at 66,527. The Rule then contains several paragraphs of analysis describing the application of each of *Chevron*'s two steps to the Rule. That discussion is compelling evidence that the Bureau did not conceive of its rule as merely interpretive. Because "interpretive rules * * * enjoy no *Chevron* status as a class," *Mead*, 533 U.S. at 232, the Bureau's exegesis on *Chevron* would have served no purpose unless the agency intended the Rule to be legislative in character.

Other evidence of agency intent points to the same conclusion. One consideration under our decisions is "whether the agency has explicitly invoked its general legislative authority." *Am. Mining Cong.*, 995 F.2d at 1112. The Rule does exactly that, invoking two separate delegations of legislative authority. *See* 83 Fed. Reg. at 66,515. The first is 18 U.S.C. § 926(a), which empowers the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of [the Gun Control Act]." The second is 26 U.S.C. § 7805(a), which grants the Attorney General authority to "prescribe all needful rules and regulations" for the

enforcement of the National Firearms Act. *See* 26 U.S.C. § 7801(a)(2)(A). Both of those provisions, the Rule states, vest "the responsibility for administering and enforcing the NFA and GCA" in the Attorney General. 83 Fed. Reg. at 66,515.

The Rule's publication in the Code of Federal Regulations also indicates that it is a legislative rule. *See Am. Mining Cong.*, 995 F.2d at 1112. By statute, publication in the Code of Federal Regulations is limited to rules "having general applicability and *legal effect*." 44 U.S.C. § 1510 (emphasis added). The Bump-Stock Rule amends three sections of the Code, modifying the regulatory definition of "machine gun" and "adding a sentence to clarify that a 'machine gun' includes * * * a bump-stock-type device." 83 Fed. Reg. at 66,519 (amending 27 C.F.R. §§ 447.11, 478.11, 479.11). Those sorts of amendments would be highly unusual for a mere interpretive rule.

In short, the Rule confirms throughout, in numerous ways, that it intends to speak with the force of law. It contained all of those indicia uniformly conveying its intended legislative character when Acting Attorney General Whitaker issued it. And it still contained those indicia when Attorney General Barr subsequently ratified it.

Notwithstanding all of that, the government's litigating position in this case seeks to reimagine the Rule as merely interpretive. The government's briefing says that the Rule is "not an act of legislative rulemaking," and that the Rule instead only "sets forth the agency's interpretation of the best reading of the statutory definition of 'machinegun.'" Gov't Br. 38.

The government's position to that effect has highly significant implications for owners of bump-stock devices. Whereas a legislative rule, as an exercise of delegated

lawmaking authority, can establish a new legal rule going forward, an interpretive rule by nature simply communicates the agency's interpretation of what a statute has always meant. So here, if the Bump-Stock Rule is merely interpretive, it conveys the government's understanding that bump-stock devices have always been machine guns under the statute. The government says exactly that in its brief, observing that, per the interpretation set out in the Rule, "any bump stock made after 1986 has *always* been a machinegun." Gov't Br. 38.

That in turn would mean that bump-stock owners have been committing a felony for the entire time they have possessed the devices. Under 18 U.S.C. § 922(o)(1), it is "unlawful for any person to transfer or possess a machinegun," and violators "shall be fined [or] imprisoned not more than 10 years, or both," *id.* § 924(a)(2). As the government acknowledges, under the view it espouses in its brief that the Rule is interpretive, the possession of bump stocks "has *always* been banned." Gov't Br. 38. And that would be so notwithstanding a number of prior contrary interpretations by the agency. *See* 83 Fed. Reg. at 13,444–13,446.

The government's account of the Rule in its brief—including its position that bump-stock owners have always been felons—is incompatible with the Rule's terms. The Rule gives no indication that bump stocks have always been machine guns or that bump-stock owners have been committing a felony for the entire time they have possessed the device. The Rule in fact says the opposite. After all, it establishes an effective date, *after* which (and only after which) bump-stock possession will be prohibited. 83 Fed. Reg. at 66,523. A future effective date of that kind cannot be reconciled with a supposed intent to convey that bump-stock possession "has *always* been banned." Gov't Br. 38.

The government now characterizes the Rule's effective date as merely marking the end of a period of discretionary withholding of enforcement, in that the Rule informs the public that the Department will "not pursue enforcement action against individuals who sold or possessed bump stocks prior to the effective date." *Id.* at 38–39. Once again, that is not what the Rule says. The government engages in enforcement discretion when it voluntarily refrains from prosecuting a person *even though he is acting unlawfully*. The Rule, by contrast, announces that a person "in possession of a bump-stock type device *is not acting unlawfully* unless they fail to relinquish or destroy their device *after* the effective date of this regulation." 83 Fed. Reg. at 66,523 (emphases added). That is the language of a legislative rule establishing when bump-stock possession will become unlawful, not an interpretive rule indicating it has always been unlawful.

In short, the government cannot now, in litigation, reconceive the Bump-Stock Rule as an interpretive rule. The character of a rule depends on the agency's intent when issuing it, not on counsel's description of the rule during subsequent litigation. *See Encino Motorcars*, 136 S. Ct. at 2122; *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). Here, that intent is unmistakable: the Bump-Stock rule is a legislative rule.

**b**

Ordinarily, legislative rules receive *Chevron* deference. *See Nat'l Mining Ass'n*, 758 F.3d at 251. This legislative rule is no different.

The Supreme Court has established that we afford *Chevron* deference if we determine (i) "that Congress delegated authority to the agency generally to make rules carrying the force of law," and (ii) "that the agency

interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–227 (2001). Here, both are true.

First, we know Congress intended a delegation of legislative authority to the agency because Congress made the relevant delegations express. As noted, the Attorney General has the power to prescribe "such rules and regulations as are necessary to carry out the provisions of" the Gun Control Act. 18 U.S.C. § 926(a). And the Attorney General "shall prescribe all needful rules and regulations for the enforcement of" the National Firearms Act. 26 U.S.C. § 7805(a); *see id.* § 7801(a)(2)(A). "[A] general conferral of rulemaking authority" of that variety "validate[s] rules for *all* the matters the agency is charged with administering." *City of Arlington v. FCC*, 569 U.S. 290, 306 (2013). The Supreme Court has said exactly that for § 7805(a), one of the delegations of authority at issue. Specifically discussing that very provision, the Court explained that it has "found such 'express congressional authorizations to engage in the process of rulemaking' to be 'a very good indicator of delegation meriting *Chevron* treatment.'" *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57 (2011) (quoting *Mead*, 533 U.S. at 229).

Second, we know that the Bureau promulgated the Bump-Stock Rule "in the exercise of that authority" to "make rules carrying the force of law" because that criterion is the defining characteristic of a legislative rule. *Mead*, 533 U.S. at 227. And we have already determined that the Rule is legislative in character. We are then firmly within *Chevron*'s domain.

Nonetheless, the parties protest the applicability of *Chevron* on several grounds. The plaintiffs first argue that *Chevron* deference has been waived or forfeited by the

government. Next, the parties (including the government) submit that *Chevron* deference is inapplicable in the context of criminal statutes. And finally, Guedes contends that *Chevron* deference for criminal statutes is displaced by the rule of lenity. None of those objections to applying *Chevron*, we conclude, is likely to succeed in the context of the Bump-Stock Rule.

**(i)**

The agency plainly believed it was acting in a manner warranting *Chevron* treatment given that it expressly invoked the *Chevron* framework in the Rule. The plaintiffs assert that the government nonetheless has forfeited, or even waived, the application of *Chevron* deference by declining to argue for it in this litigation. And while the government has not taken a definitive position before us on whether *Chevron* can be waived or forfeited, it has declined to invoke *Chevron* throughout the course of the litigation.

In particular, in its briefing before the district court, the government expressly disclaimed any entitlement to *Chevron* deference. And after the district court nonetheless relied on *Chevron* to affirm the Rule, the government filed notices in other pending challenges to the Rule, stating that it "ha[s] not contended that the deference afforded under *Chevron* * * * applies in this action.'" *E.g.*, Notice of Supplemental Authority at 2, *Gun Owners of Am., Inc. v. Barr*, No. 1:18-cv-1429 (W.D. Mich. Feb. 27, 2019), ECF No. 38. Now, in this appeal, the government affirmatively disclaims any reliance on *Chevron*. *See* Gov't Br. 37. And at oral argument, the government went so far as to indicate that, while it believes the Rule should be upheld as the best reading of the statute without any need for *Chevron* deference, if the Rule's validity turns on the applicability of *Chevron*, it would prefer that the Rule be set

aside rather than upheld under *Chevron*. Oral Argument at 42:38–43:45.

To the extent *Chevron* treatment can be waived, we assume that the government's posture in this litigation would amount to a waiver rather than only a forfeiture. *See Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012) ("A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve."). But our court has yet to address whether, when an agency promulgates a rule that would otherwise plainly occasion the application of *Chevron*, agency counsel could nonetheless opt to effect a waiver of *Chevron* treatment when later defending against a challenge to the rule.

We have, however, held that an agency's lawyers cannot *forfeit* the applicability of *Chevron* deference unless the underlying agency action fails to "manifests its engagement in the kind of interpretive exercise to which review under *Chevron* generally applies—i.e., interpreting a statute it is charged with administering in a manner (and through a process) evincing an exercise of its lawmaking authority." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018). We grounded our holding in the principle that "it is the expertise of the agency, not its lawyers," that underpins *Chevron*. *Id.* (quoting *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 n.3 (D.C. Cir. 2006)); *see also Chenery*, 318 U.S. at 87–88. We see no reason that the same limitations on forfeiture of *Chevron* should not also govern waiver of *Chevron*.

Forfeiture and waiver involve, respectively, a failure to invoke, or an affirmative decision not to invoke, a party's "right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). But *Chevron* is not a "right" or "privilege" belonging to a

litigant. It is instead a doctrine about statutory meaning—specifically, about how courts should construe a statute.

If a statute contains ambiguity, *Chevron* directs courts to construe the ambiguity as "an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). If there is ambiguity, the meaning of the statute becomes whatever the agency decides to fill the gaps with, as long as the agency's interpretation is reasonable and "speak[s] with the force of law." *Mead*, 533 U.S. at 229. And insofar as *Chevron* concerns the meaning of a statute, it is an awkward conceptual fit for the doctrines of forfeiture and waiver.

We, for example, would give no mind to a litigant's failure to invoke interpretive canons such as *expressio unius* or constitutional avoidance even if she intentionally left them out of her brief. "[T]he court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). The "independent power" to identify and apply the correct law presumably includes application of the *Chevron* framework when determining the meaning of a statute.

Allowing an agency to freely waive *Chevron* treatment in litigation also would stand considerably in tension with basic precepts of administrative law. As we have explained, a legislative rule qualifying for *Chevron* deference remains legislative in character even if the agency claims during litigation that the rule is interpretive: *Chenery* instructs that the proper subject of our review is what the agency actually did, not what the agency's lawyers later say the agency did. *See* 318 U.S. at 87–88. Accordingly, we have held that a particular

rule is legislative rather than interpretive over the protestations of the agency. *See, e.g.*, *Cmty. Nutrition Inst.*, 818 F.2d at 946. And once we conclude that a rule is legislative, it follows that we generally review the rule's validity under the *Chevron* framework. *See Nat'l Mining Ass'n*, 758 F.3d at 251.

A waiver regime, moreover, would allow an agency to vary the binding nature of a legislative rule merely by asserting in litigation that the rule does not carry the force of law, even though the rule speaks to the public with all the indicia of a legislative rule. Agency litigants then could effectively amend or withdraw the legal force of a rule without undergoing a new notice-and-comment rulemaking. That result would enable agencies to circumvent the Administrative Procedure Act's requirement "that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015). And an agency could attempt to secure rescission of a policy it no longer favors without complying with the Administrative Procedure Act, or perhaps could avoid the political accountability that would attend its own policy reversal by effectively inviting the courts to set aside the rule instead.

We thus conclude, consistent with *SoundExchange*'s approach to forfeiture of *Chevron*, that an agency's lawyers similarly cannot waive *Chevron* if the underlying agency action "manifests its engagement in the kind of interpretive exercise to which review under *Chevron* generally applies." *SoundExchange*, 904 F.3d at 54. In that event, we "apply *Chevron* * * * even if there is no invocation of *Chevron* in the briefing in our court." *Id.*

In this case, the Bump-Stock Rule plainly indicates the agency's view that it was engaging in a rulemaking entitled to

*Chevron* deference. That observation naturally follows from the Rule's legislative character, which generally yields treatment under *Chevron*. *See Nat'l Mining Ass'n*, 758 F.3d at 251. And for this Rule in particular, another telltale sign of the agency's belief that it was promulgating a rule entitled to *Chevron* deference is the Rule's invocation of *Chevron* by name. To be sure, an agency of course need not expressly invoke the *Chevron* framework to obtain *Chevron* deference: "*Chevron* is a standard of *judicial* review, not of *agency* action." *SoundExchange*, 904 F.3d at 54. Still, the Bureau's invocation of *Chevron* here is powerful evidence of its intent to engage in an exercise of interpretive authority warranting *Chevron* treatment.

The Bureau, in rejecting objections that the agency's interpretation "would not be entitled to deference under *Chevron*," 83 Fed. Reg. at 66,526, specifically invoked the *Chevron* framework and marched through its two-step analysis, *id.* at 66,527. At step one, the agency explained that its interpretation "accord[ed] with the plain meaning" of the statute. And at step two, the agency explained that it "ha[d] the authority to interpret elements of the definition of 'machinegun' like 'automatically' and 'single function of the trigger,'" concluding that its "construction of those terms is reasonable under *Chevron* [Step Two]." *Id*.

The Rule expressly defends the agency's reading of the statute as an interpretive exercise implicating *Chevron*. Agency counsel's later litigating decision to refrain from invoking *Chevron* thus affords no basis for our denying the Rule *Chevron* status.

**(ii)**

Next, the plaintiffs submit that *Chevron* deference has no application to regulations interpreting statutes like the National Firearms Act and the Gun Control Act because they impose criminal penalties on violators. *Chevron* deference in the context of such statutes, the plaintiffs urge, would flout an understanding that "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). And the plaintiffs are not the only parties who question *Chevron*'s salience in the criminal context. The government's decision to refrain from invoking *Chevron* in this litigation appears to stem from the same concerns. *See* Gov't Br. 36–37.

Guedes and Codrea, however, have failed to demonstrate a likelihood of success in establishing a general rule against applying *Chevron* to agency interpretations of statutes that have criminal-law implications. To the contrary, precedent says otherwise.

Start with *Chevron* itself. At issue in *Chevron* was the meaning of the term "stationary source" in the Clean Air Act. *See Chevron*, 467 U.S. at 840. The scope of that term defined the statutory obligation of private parties, under state implementation plans, to obtain permits for the construction and operation of "new or modified major stationary sources of air pollution." 42 U.S.C. § 7502(a)(1), (b)(6) (1982). But at the time, any person who knowingly violated any requirement of a state implementation plan (after notice from the EPA) faced a fine of $25,000 a day or imprisonment for up to a year, or both. *See id.* § 7413(c)(1) (1982). Nevertheless, the *Chevron* Court established the decision's namesake deference.

For another example, consider the securities laws. The SEC's interpretation of those laws regularly receives *Chevron* treatment, *e.g.*, *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 366 (D.C. Cir. 2014); *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 172–173 (D.C. Cir. 2010); *Markowski v. SEC*, 274 F.3d 525, 528–529 (D.C. Cir. 2001), even though their violation often triggers criminal liability. The Securities Exchange Act, for instance, imposes criminal sanctions for willful violations of "any provision" of the Act or "any rule or regulation thereunder the violation of which is made unlawful." 15 U.S.C. § 78ff(a). Yet in *United States v. O'Hagan*—a criminal case—the Supreme Court accorded *Chevron* deference to an SEC rule that interpreted a provision of the Act in a manner rendering the defendant's conduct a crime. 521 U.S. 642, 667, 673 (1997) (citing *Chevron*, 467 U.S. at 844). The Court noted that Congress had authorized the Commission "to prescribe legislative rules," and held that the rule in question, issued in an exercise of that authority, should receive "controlling weight" under *Chevron*. *Id.* at 673 (quoting *Chevron*, 467 U.S. at 844).

While the Court in *O'Hagan* applied *Chevron* in a criminal case, it (like *Chevron* itself) did not specifically address whether the criminal context should have afforded a basis for denying deference to the agency's interpretation. But the Court engaged with that precise issue in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995). There, the Court reviewed a regulation interpreting the term "take" in the Endangered Species Act. The challengers argued that *Chevron* deference was inappropriate because the Endangered Species Act included criminal penalties for certain violations. *See id.* at 704 n.18. The Court disagreed, holding that, notwithstanding the statute's criminal penalties, it would defer "to the Secretary's reasonable interpretation" under *Chevron*. *See id*. at 703–704 & 704 n.18.

Our circuit precedent is in accord. Recently, in *Competitive Enterprise Institute v. United States Department of Transportation*, 863 F.3d 911 (D.C. Cir. 2017), we explained that "[w]e apply the *Chevron* framework * * * even though violating [the statute] can bring criminal penalties," *id.* at 915 n.4 (citing *Babbitt*, 515 U.S. at 704 n.18); *see id.* at 921 (Kavanaugh, J., concurring) ("I join the majority opinion[.]"). That precedent is controlling here. *See also Humane Society v. Zinke*, 865 F.3d 585, 591, 595 (D.C. Cir. 2017) (applying *Chevron* even though the challenged rule interpreted the Endangered Species Act, the violation of which results in "criminal sanctions").

Also, at least twice before, we afforded *Chevron* deference to an agency's construction of a statute in the criminal context over the express objection of a defendant. In *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999), the defendants "argue[d] that this court should not give *Chevron* deference to the FEC's interpretation of an ambiguous statute in a criminal proceeding," *id.* at 1047 n.17. We disagreed: "That criminal liability is at issue does not alter the fact that reasonable interpretations of the act are entitled to deference." *Id.* (citing *Babbitt*, 515 U.S. at 703–705). And in *In re Sealed Case*, 223 F.3d 775 (D.C. Cir. 2000), we again declined to forgo *Chevron* in a criminal context, holding that "[d]eference is due as much in a criminal context as in any other," *id.* at 779 (citing *Babbitt*, 515 U.S. at 703–705).

To be sure, the Supreme Court has signaled some wariness about deferring to the government's interpretations of criminal statutes. *See Abramski*, 573 U.S. at 191; *see also United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."). But those statements were made outside the context of a *Chevron*-eligible interpretation—that is, outside

the context of an agency "speak[ing] with the force of law." *Mead*, 533 U.S. at 229. In *Abramski*, the Court declined to extend deference to informal guidance documents published by the Bureau. *See* 573 U.S. at 191. And in *Apel*, the Court declined to defer to an interpretation contained in "Executive Branch documents" that were "not intended to be binding." 571 U.S. at 368. When directly faced with the question of *Chevron*'s applicability to an agency's interpretation of a statute with criminal applications through a full-dress regulation, the Court adhered to *Chevron*. *See Babbitt*, 515 U.S. at 704 n.18.

That holding, and our court's precedents, govern us here and call for the application of *Chevron*. The parties have identified no distinction between the provision at issue in this case and the provisions with criminal penalties to which *Chevron* deference has been applied. The briefing contains nary a word suggesting any distinction between this case and prior decisions applying *Chevron* in criminal contexts. And neither Guedes nor counsel for the government offered any distinction even when specifically asked at oral argument. *See* Oral Argument at 6:08–7:15, 45:45–49:00.

Nothing in the relevant statutory delegations of authority, moreover, suggests a basis for denying *Chevron* treatment for agency actions with criminal implications The Supreme Court has instructed that the inquiry turns on whether the "language of the delegation provision" is sufficiently "broad" such that it is "clear * * * the statute gives [the] agency * * * power to enforce *all* provisions of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (emphasis added). In *Gonzales*, for example, the Court found that the Attorney General lacked power to interpret a particular criminal provision of the Controlled Substances Act because the delegation of rulemaking authority was too narrow and "did not delegate to

the Attorney General authority to carry out or effect *all* provisions of the CSA." *Id.* at 259 (emphasis added). By contrast, the two pertinent delegation provisions in this case are framed in broad terms. *See* 18 U.S.C. § 926(a) (delegating to Attorney General the power to prescribe "such rules and regulations as are necessary to carry out the provisions of [the Gun Control Act]"); 26 U.S.C. § 7805(a) (delegating to Attorney General, *see id.* § 7801(a)(2)(A), the power to "prescribe all needful rules and regulations for the enforcement of [the National Firearms Act]").

The statutory context bolsters the inference that Congress intended those delegations to encompass regulations with criminal implications. The Gun Control Act, found at Chapter 44 of Title 18, is a purely criminal statute. *See* 18 U.S.C. § 924(a)(2). Yet § 926(a) expressly delegates to the Attorney General the power to promulgate "such rules and regulations as are necessary to carry out the provisions of th[at] chapter." Similarly, the National Firearms Act, found at Chapter 53 of Title 26, has criminal applications. *See* 18 U.S.C. § 924(a)(2); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992). The penalty for "fail[ing] to comply with any provision of th[at] chapter" is a fine of up to $10,000, or imprisonment for up to 10 years, or both. 26 U.S.C. § 5871. And yet § 7801(a)(2)(A) tasks the Attorney General with "[t]he administration and enforcement of * * * Chapter 53," including "prescrib[ing] all needful rules and regulations for * * * enforcement." *Id.* § 7805(a).

The plaintiffs rely on *United States v. Thompson/Center Arms Co.*, in which the Supreme Court applied the rule of lenity to an ambiguous provision of the National Firearms Act. 504 U.S. at 517–518. But *Babbitt* later made clear that the Court in *Thompson/Center* had no occasion to apply *Chevron*: *Thompson/Center*, the *Babbitt* Court explained, "rais[ed] a

narrow question concerning the application of a statute that contain[ed] criminal sanctions * * * *where no regulation was present*." *Babbitt*, 515 U.S. at 704 n.18 (emphasis added). If anything, then, *Babbitt* implies that *Chevron* should apply in a case—like this one—involving an interpretation of the National Firearms Act where a regulation *is* present.

The plaintiffs also cite *United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987), a pre-*Babbitt* decision that interpreted the statute-of-limitations provision of the Foreign Agents Registration Act. We observed in passing that, "[n]eedless to say, in this criminal context, we owe no deference to the Government's interpretation of the statute." *Id.* at 1080 n.17. As in *Thompson/Center*, however, the *McGoff* Court had no occasion to apply *Chevron* because the government never asserted reliance on a regulation or other *Chevron*-eligible instrument. *See id.*

At oral argument, the plaintiffs suggested that permitting an agency's interpretation to carry the force of law in the criminal context would infringe the separation of powers. *See* Oral Argument 6:51–6:58. That suggestion is difficult to square with the Supreme Court's decision in *Touby v. United States*, 500 U.S. 160 (1991). There, the Court upheld a delegation of legislative authority to the Attorney General to schedule substances under the Controlled Substances Act against a challenge under the nondelegation doctrine. *Id.* at 164. The Court held that, in the criminal context, as in all contexts, the separation of powers "does not prevent Congress from seeking assistance * * * from its coordinate Branches" so long as Congress "lays down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Id.* at 165 (alterations omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409

(1928)).  And no party suggests that such an intelligible principle is lacking in this case.

In short, Congress delegated authority to administer the National Firearms Act and the Gun Control Act to the Attorney General, and the Attorney General promulgated a legislative rule in the exercise of that authority.  Under binding precedent, Guedes and Codrea have failed to demonstrate a likelihood of success on their claim that the Rule is invalid just because of its criminal-law implications.

### (iii)

Relatedly, Guedes argue that *Chevron* is inapplicable because a different canon of interpretation, the rule of lenity, should control instead.  Under the rule of lenity, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Rewis v. United States*, 401 U.S. 808, 812 (1971).  Guedes reasons that because *Chevron* is premised on the existence of statutory ambiguity, and because the rule of lenity resolves ambiguity in favor of the defendant, there is no remaining ambiguity to which *Chevron* can apply.

It is true that the rule of lenity generally applies to the interpretation of the National Firearms Act and the Gun Control Act.  But in circumstances in which *both Chevron* and the rule of lenity are applicable, the Supreme Court has never indicated that the rule of lenity applies first.  In fact, the Court has held to the contrary.  In *Babbitt*, the Court squarely rejected the argument that "the rule of lenity should foreclose any deference to the Secretary's interpretation of the ESA because the statute includes criminal penalties."  515 U.S. at 704 n.18.  The Court observed that it had "never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the

governing statute authorizes criminal enforcement." *Id.* The Court proceeded to apply *Chevron* deference. *Id.* at 703.

Our precedent takes the same tack. In *Kanchanalak*, we expressly rebuffed the argument that Guedes now presses: "To argue, as defendants do, that the rule of lenity compels us to reject the FEC's otherwise reasonable interpretation of an ambiguous statutory provision [under *Chevron*] is to ignore established principles of law." 192 F.3d at 1050 n.23 (citing *Babbitt*, 515 U.S. at 704 n.18).

Those precedents are in line with the Supreme Court's characterization of the rule of lenity as a canon of "last resort." The Court has instructed that "[t]he rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan v. United States*, 364 U.S. 587, 596 (1961). Accordingly, the rule of lenity applies only "when the ordinary canons of statutory construction have revealed no satisfactory construction." *Lockhart v. United States*, 136 S. Ct. 958, 968 (2016). And *Chevron* is a rule of statutory construction, insofar as it is a doctrine that "constru[es] what Congress has expressed." *Callanan*, 364 U.S. at 596.

Finally, our approach coheres with the rule of lenity's purposes. The doctrine serves to ensure that "legislatures and not courts [are] defin[ing] criminal activity" and to secure "fair warning" about the content of criminal law. *United States v. Bass*, 404 U.S. 336, 348 (1971) (internal quotation marks omitted). *Chevron* deference vindicates both purposes.

First, *Chevron* is consistent with the separation of powers, including for regulations defining criminal activity, because delegations of legislative authority in the criminal sphere are

constitutional. *See Touby*, 500 U.S. at 165. The parties would have us disregard Congress's textual delegations to the agency and do the interpretive work instead. That course, though, would not respect the notion that "legislatures and not courts" should take the lead. *Bass*, 404 U.S. at 348.

Second, *Chevron* promotes fair notice about the content of criminal law. It applies only when, at Congress's direction, agencies have followed "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead*, 533 U.S. at 230. Importantly, such procedures, which generally include formal public notice and publication in the Federal Register, do not "provide such inadequate notice of potential liability as to offend the rule of lenity." *Babbitt*, 515 U.S. at 704 n.18. Tellingly, there is no suggestion of inadequate notice here. Rather, if the Rule is a valid legislative rule, all are on notice of what is prohibited.

For substantially the same reasons, plaintiffs' challenge under the Due Process Clause cannot succeed. To apply *Chevron*, Codrea notes, we must first determine that the statute is ambiguous, but that, in Codrea's view, would imply that the statute is facially void for vagueness. Codrea's challenge is misconceived. A criminal statute is void for vagueness if it fails to provide ordinary people "fair notice" of the conduct it proscribes. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018). But the promulgation of the Bump-Stock Rule through notice-and-comment procedures afforded "fair notice" of the prohibited conduct.

**2**

Having concluded that the *Chevron* framework is applicable, we now proceed to examine the Bump-Stock Rule

under it.  We first ask whether the agency-administered statute is ambiguous on the "precise question at issue."  *Chevron*, 467 U.S. at 842.  If the statute's meaning is unambiguous, then we need go no further.  But if we find ambiguity, we proceed to the second step and ask whether the agency has provided a "permissible construction" of the statute.  *Id.* at 843.  At that stage, "the task that confronts us is to decide, not whether [the agency's interpretation is] the best interpretation of the statute, but whether it represents a reasonable one."  *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 389 (1998).

The National Firearms Act and the Gun Control Act both define "machinegun" to mean "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(23).  The definition of "machinegun" also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  26 U.S.C. § 5845(b).

The Bump-Stock Rule determines that semiautomatic rifles equipped with bump-stock-type devices are "machineguns" because they "function[] as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds" through "a single pull of the trigger."  83 Fed. Reg. at 66,553.  Applying *Chevron*, we determine that the statutory definition of "machinegun" is ambiguous and the Bureau's interpretation is reasonable.  The plaintiffs therefore are unlikely to succeed on the merits of their claim that the Rule is out of step with the statutory definition.

47

**a**

At *Chevron*'s first step, two features of the statutory definition of "machinegun" render it ambiguous. The first is the phase "single function of the trigger." The second is the word "automatically." We discuss them in that order.

**(i)**

As the district court recognized, the statutory phrase "single function of the trigger" admits of more than one interpretation. It could mean "a mechanical act of the trigger." *Guedes*, 356 F. Supp. 3d at 130. Or it could mean "a single pull of the trigger from the perspective of the shooter." *Id.*

The first interpretation would tend to exclude bump-stock devices: while a semiautomatic rifle outfitted with a bump stock enables a continuous, high-speed rate of fire, it does so by engendering a rapid bumping of the trigger against the shooter's stationary finger, such that each bullet is fired because of a distinct mechanical act of the trigger. The second interpretation would tend to include bump-stock devices: the shooter engages in a single pull of the trigger with her trigger finger, and that action, via the operation of the bump stock, yields a continuous stream of fire as long she keeps her finger stationary and does not release it. *See* 83 Fed. Reg. at 66,519.

Neither of those interpretations is compelled (or foreclosed) by the term "function" in "single function of the trigger." The word "function" focuses our attention on the "mode of action," 4 Oxford English Dictionary 602 (1933), or "natural * * * action," Webster's New International Dictionary 876 (1933), by which the trigger operates. But the text is silent on the crucial question of *which perspective* is relevant.

A mechanical perspective, for instance, might focus on the trigger's release of the hammer, which causes the release of a round. From that perspective, a "single function of the trigger" yields a single round of fire when a bump-stock device moves the trigger back and forth. By contrast, from the perspective of the shooter's action, the function of pulling the trigger a single time results in repeated shots when a bump-stock device is engaged. From that perspective, then, a "single function of the trigger" yields multiple rounds of fire.

In light of those competing, available interpretations, the statute contains a "gap for the agency to fill." *Chevron*, 467 U.S. at 843.

Guedes argues that the phrase "single function of the trigger" unambiguously compels a focus on the trigger's mechanical operation. He contends, for example, that "[r]egardless of the mechanism by which the shooter acts * * * it is the movement of the trigger releasing the hammer * * * that define[s] the boundaries of two distinct 'single' functions of the trigger." Guedes Br. 12–13. That argument begs the crucial question of perspective. It may be reasonable to take the view, as Guedes does, that the mechanical operation of the trigger is the lens through which to view its function. But to establish a likelihood of success on the merits, Guedes and Codrea would have to establish that reading the statute to mean a "single pull of the trigger" by the shooter is *impermissible*. They have not done so.

At *Chevron*'s first step, we do not ask which of those interpretations is the better reading of the statute. Rather, we ask whether either of those interpretations is unambiguously "compel[led]" by the statute, to the exclusion of the other one. *Chevron*, 467 U.S. at 860. Here, we think the answer is no.

Nor does *Staples v. United States*, 511 U.S. 600 (1994), compel a particular interpretation of "single function of the trigger." There, in a footnote, the Court observed that a weapon is "automatic" if it "fires repeatedly with a single pull of the trigger"—"[t]hat is, [if] once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.* at 602 n.1. The Court's description, then, speaks both in terms of a "single *pull* of the trigger" and a "release[]" of the trigger, *id.* (emphasis added), which ultimately sheds limited light on the choice between the two competing understandings of "function of the trigger" that are at issue here. Regardless, the precise definition of "single function of the trigger" was not at issue in *Staples*. *See id.* at 602. And the Court did not purport to exclude any interpretation as foreclosed by the statute. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 996 (2005).

**(ii)**

Similarly, the statutory term "automatically" admits of multiple interpretations. The statute speaks in terms of a "weapon which shoots * * * automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see* 18 U.S.C. § 921(a)(23). The term "automatically" does not require that there be *no* human involvement to give rise to "more than one shot." Rather, the term can be read to require only that there be *limited* human involvement to bring about more than one shot. *See, e.g.*, Webster's New International Dictionary 157 (defining "automatically" as the adverbial form of "automatic"); *id.* at 156 (defining "automatic" as "self-acting or self-regulating," especially applied to "machinery or devices which perform *parts* of the work formerly or usually done by hand" (emphasis

added)). But how much human input in the "self-acting or self-regulating" mechanism is too much?

The plaintiffs would read the phrase "by a single function of the trigger" to provide "the starting and the ending point of just how much human input is allowable." Codrea Br. 14. In their view, then, a gun cannot be said to fire "automatically" if it requires both a single pull of the trigger *and* constant pressure on the gun's barrel, as a bump-stock device requires. We are unpersuaded. After all, a quite common feature of weapons that indisputably qualify as machine guns is that they require both a single pull of the trigger *and* the application of constant and continuing pressure on the trigger after it is pulled. We know, therefore, that the requirement of some measure of additional human input does not render a weapon nonautomatic. To purloin an example from the district court: an "automatic" sewing machine still "requires the user to press a pedal *and* direct the fabric." *Guedes*, 356 F. Supp. 3d at 131 (emphasis added).

That workaday example illustrates another, perhaps more natural, reading of "automatically": the "automatic[]" mechanism need only be "*set in motion*" by a single function of the trigger. *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (emphasis added); *see also United States v. Evans*, 978 F.2d 1112, n.2 (9th Cir. 1992) ("'[B]y a single function of the trigger' describes the action that enables the weapon to 'shoot automatically without manual reloading, not the 'trigger' mechanism." (ellipses omitted)). That is, rather than reading the phrase "by a single function of the trigger" to mean "by *only* a single function of the trigger," the phrase can naturally be read to establish only the preconditions for setting off the "automatic" mechanism, without foreclosing some further degree of manual input such as the constant forward pressure needed to engage the bump stock in the first instance.

And if so, then the identified ambiguity endures. How much further input is permitted in the mechanism set in motion by the trigger? The statute does not say.

In sum, the statutory definition of "machinegun" contains two central ambiguities, both of which the agency has attempted to construe. We therefore proceed to *Chevron*'s second step.

**b**

At the second step, "the question for the court is whether the agency's [construction] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Guedes and Codrea are not likely to succeed in showing that the agency has impermissibly interpreted both ambiguities.

The Bureau's interpretation of "single function of the trigger" to mean "single pull of the trigger" is a permissible reading of the statute. The Bureau is better equipped than we are to make the pivotal policy choice between a mechanism-focused and shooter-focused understanding of "function of the trigger." And the Bureau's interpretation comports with how some courts have read the statute, which is a strong sign of reasonableness. In *United States v. Akins*, 312 F. App'x 197 (11th Cir. 2009), for example, the Eleventh Circuit held that the Bureau's reading of "single function of the trigger" to mean "single pull of the trigger" was "consonant with the statute and its legislative history." *Id.* at 200. The court relied on that definition to conclude that an "Accelerator"—a type of bump stock—was reasonably classified as a machine gun. *Id.* And "single pull of the trigger" has been the definition the agency has employed since 2006. *See* 83 Fed. Reg. at 66,543.

The Rule's interpretation also accords with how the phrase "single pull of the trigger" was understood at the time of the enactment of the National Firearms Act. *See* 83 Fed. Reg. at 66,518. The Rule cites a congressional hearing for the National Firearms Act in which the then-president of the National Rifle Association testified that the term "machine gun" included any gun "capable of firing more than one shot by a single pull of the trigger, a single function of the trigger." 83 Fed. Reg. 66,518. And the House Report accompanying the bill that eventually became the National Firearms Act states that the bill "contains the usual definition of a machine gun as a weapon designed to shoot more than one shot * * * by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2 (1934).

The Bureau's interpretation of "automatically" is permissible too. The Rule's requirement of a "self-acting or self-regulating mechanism" demands a significant degree of autonomy from the weapon without mandating a firing mechanism that is completely autonomous. That definition accords with the everyday understanding of the word "automatic." And it focuses the inquiry about what needs to be automated right where the statute does: the ability of the trigger function to produce "more than one shot, without manual reloading." 26 U.S.C. § 5845(b). It also tracks the interpretation reached by the Seventh Circuit in *United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009), in which the court interpreted the term to require a "self-acting mechanism" without requiring more, *id.* at 658.

The plaintiffs argue that the Bureau's definition of "machinegun" is unreasonable because it has the effect of reaching all semiautomatic rifles. Because "virtually all" semiautomatic rifles can be "bump-fired" with the use of common household items, the plaintiffs contend, the Bureau's

definition covers even unmodified semiautomatic rifles, which renders it unreasonable. Guedes Br. 18.

The Rule explains why the plaintiff's understanding is incorrect, and the Rule's explanation in that regard is reasonable. *See* 83 Fed. Reg. at 66,532–66,534. The Bureau acknowledges that bump firing—a technique using a stable point like a belt loop to approximate the function of a bump stock—is possible with semiautomatic weapons. *See id.* at 66,533. But even when a semiautomatic weapon is bump fired using an object like a belt loop or a rubber band, the Bureau explained, the weapon does not fire "automatically" because there is no "self-acting or self-regulating mechanism." Rubber bands and their ilk do not "capture and direct the recoil energy" to "harness[] [it] as part of a continuous back-and-forth cycle." *Id.* at 66,533. Rather, "the shooter must do so" herself. *Id.* Bump firing without the aid of a bump-stock-type device is therefore "more difficult" because it relies solely on the shooter "to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils." *Id.*

Bump stocks, on the other hand, are specifically designed to "direct[] the recoil energy of the discharged rounds * * * in constrained linear rearward and forward paths." *Id.* at 66,532. By capturing the recoil energy of the gun and directing it through a specified "distance" and along a specified "plane," bump stocks "incorporate[] a self-acting or self-regulating component" that would otherwise be absent. *Id.* at 66,533. Thus, belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory "machineguns." Or so the Bureau reasonably concluded in the Rule.

"If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if

the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980. Here, the Bump-Stock Rule sets forth a permissible interpretation of the statute's ambiguous definition of "machinegun." It therefore merits our deference.

## C

In addition to their argument that the Rule is incompatible with the statutory definition of a machine gun, the plaintiffs also contend that the Rule is arbitrary and capricious. Agency action is arbitrary or capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the plaintiffs claim that, for various reasons, the Rule is arbitrary in applying the statutory definition of "machinegun" to bump stocks. None of their claims is likely to succeed.

*First*, the plaintiffs argue that the Rule fundamentally mischaracterizes the operation of bump-stock devices. In their view, the Rule disregards that, for each shot, "the shooter must manually and volitionally *push* the trigger into [a] stationary finger." Guedes Br. 24. It is true that, for a bump-stock-equipped device to repeatedly fire, the shooter must keep the bumpstock engaged by maintaining constant forward pressure on the gun. But in the Rule, the Bureau correctly describes the operation of bump-stock-equipped devices: the shooter must "maintain[] constant forward pressure [on the gun] with the non-trigger hand" in order to maintain continuous fire. 83 Fed. Reg. at 66,532. The bump stock takes advantage of the gun's

recoil, channeled into a linear back-and-forth cycle, to permit the shooter to fire continuously by maintaining steady forward pressure on the gun. There is thus no disagreement about the basic mechanics of bump-stock devices.

Guedes takes particular issue with the Rule's characterization of recoil. He argues that bump-stock-equipped devices cannot "harness[] the recoil energy of the firearm" because they do not use "a device such as a spring or hydraulics * * * [to] automatically absorb the recoil and use this energy to activate itself." Guedes Br. 16–17. But the Rule does not adopt such an impoverished definition of "automatically." The Rule requires only that the recoil be used in service of a "self-acting or self-regulating mechanism." A bump stock "direct[s] the recoil energy of the discharged rounds * * * in constrained linear rearward and forward paths," 83 Fed. Reg. at 66,518 (quoting 83 Fed. Reg. at 13,443), which qualifies as a "self-regulating mechanism."

*Second*, the plaintiffs assert that the Rule is arbitrary because its definition encompasses all semiautomatic weapons. That argument is largely redundant of the plaintiffs' *Chevron* step two argument to the same effect, which we have already addressed. We dispose of this iteration of the same argument on the same grounds: Bump stocks, unlike commonplace household objects, are specifically designed to "direct[] the recoil energy of the discharged rounds * * * in constrained linear rearward and forward paths." *Id.* Bump stocks, unlike household objects, are machine guns because they alone involve a "self-acting or self-regulating mechanism." *Id.*

*Third*, the plaintiffs submit that the Rule arbitrarily excludes binary-trigger guns from its definition of "machinegun." Binary-trigger guns shoot one round when the trigger is pulled and another round when the trigger is released.

83 Fed. Reg. at 66,534. The Rule concludes that such devices are not machine guns because the second shot is "the result of a separate function of the trigger." *Id.* The plaintiffs argue that if the release of the trigger is a separate function, the operation of a bump stock—which requires the shooter to keep the trigger finger stationary while steadily pushing the gun forward into the finger—must also involve multiple functions of the trigger. But the Rule reasonably distinguishes binary-trigger guns on the ground that they require a second act of volition *with the trigger finger*. The release of a trigger is a volitional motion. But merely holding the trigger finger stationary—which is what operation of a bump stock entails—is not.

*Fourth*, Guedes contends that the Rule is arbitrary because its definition of "automatically" is ambiguous. The Rule's definition, Guedes notes, does not specify how much manual input is too much. But the existence of latent ambiguity does not render an interpretation arbitrary or capricious. Agencies are permitted to promulgate regulations interpreting ambiguous statutes without having to resolve *all* possible ambiguity.

*Fifth*, Codrea argues that the Rule arbitrarily failed to consider reliance interests, "an important aspect of the problem." *State Farm*, 463 U.S. at 43. It is true that "the APA requires an agency to provide more substantial justification when * * * its prior policy has engendered serious reliance interests that must be taken into account." *Perez*, 135 S.Ct. at 1209 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). But the only reliance interest identified by Codrea is the pecuniary interest of current possessors of bump-stock devices. *See* Codrea Br. 19–20 & 19 n.4; Comment of Maryland Shall Issue at 6. And in the Rule, the Bureau engaged in a cost-benefit analysis that considered, among other

things, the cost incurred by owners of bump-stock devices. *See* 83 Fed. Reg. at 66,546.

*Finally*, Guedes argues that the Rule is arbitrary because it is the product of "naked political desire." Guedes Br. 18. Insofar as Guedes means to claim that the Rule arises from political considerations, he is surely right. All would agree that the Bureau enacted this Rule in response to the urging of "the President, Members of Congress, and others," as part of an "immediate and widespread" outcry in the wake of the 2017 mass shooting in Las Vegas. *Guedes*, 356 F. Supp. 3d at 120, 123. The Rule itself describes its origins in a memorandum issued by President Trump to then–Attorney General Sessions "direct[ing] the Department of Justice * * * 'as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.'" 83 Fed. Reg. at 66,516–66,517 (quoting Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices, 83 Fed. Reg. 7,949 (Feb. 23, 2018)). But that is hardly a reason to conclude that the Rule is arbitrary. Presidential administrations are elected to make policy. And "[a]s long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (quoting *State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part)).

Guedes might instead mean to contend that the Bureau was so eager to enact the policy preferences of the President that it failed to engage in reasoned consideration of the issues. The central purpose of arbitrary or capricious review is to assure that the agency has engaged in "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. We ordinarily do so, however, by

examining whether the agency has "articulate[d] a satisfactory explanation for its actions." *Id.* at 43. Here, the agency *has* articulated a satisfactory explanation for the Bump-Stock Rule. And the administrative record reflects that the agency kept an open mind throughout the notice-and-comment process and final formulation of the Rule. *See Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–488 (D.C. Cir. 2011); *C&W Fish Co. v. Fox*, 931 F.2d 1556, 1564–1565 (D.C. Cir. 1991). In the absence of any actual evidence of delinquent conduct, we accord the Bureau a "presumption of regularity" in its promulgation of the Rule. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

**D**

Finally, Codrea argues that the Rule must be vacated because it is impermissibly retroactive, violating both 26 U.S.C. § 7805(b)'s bar on retroactive rulemaking and the Ex Post Facto Clause. That claim has been forfeited because the plaintiffs failed to raise it in the district court. The Rule, at any rate, cannot be characterized as retroactive: As we have explained, the Rule itself made clear that the possession of bump stocks would become unlawful only after the effective date.

Further, it matters not that the government's *post hoc* litigation strategy has been to characterize the Rule as merely interpretive and, consequently, backward looking. Irrespective of that litigating position, the Rule is legislative in character and therefore purely prospective. Any criminal consequences did not attach until the Rule's effective date. And notice to the public has been clear and explicit.

59

\* \* \* \* \*

The plaintiffs have failed to establish a likelihood of success both for their challenge to Acting Attorney General Whitaker's appointment and for their objections to the substantive validity of the Rule.  For the foregoing reasons, we affirm the district court's denial of a preliminary injunction.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part: Federal law makes it a crime to possess or transfer a "machinegun." 18 U.S.C. § 922(o)(1). This case is about a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regulation that reinterprets the statutory definition of "machinegun" and applies it to all bump stock type devices. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (Bump Stock Rule or Rule). Individual firearms owners and non-profit groups sued the ATF, seeking preliminary injunctive relief to stop the Bump Stock Rule from going into effect. The issue before us on this expedited appeal of the district court's denial of preliminary injunctive relief, *Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019), is whether the plaintiffs are likely to succeed on the merits of their challenge to the Bump Stock Rule as contrary to the statutory definition of "machinegun." Unlike my colleagues, I believe the Bump Stock Rule does contradict the statutory definition and, respectfully, part company with them on this issue.[1]

A "machinegun" is a firearm "which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). In my view, the Rule impermissibly adds to the language "automatically . . . by a single function of the trigger," including within its definition a firearm that shoots more rapidly only by a single function of the trigger *and* the shooter's additional manual input. The statute specifies a single function; the Rule specifies a single function *plus*. "Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly," we have "an obligation to correct its error." *Abramski v. United States*, 573 U.S. 169, 191 (2014).

---

[1] I concur in Parts II and III.A of the majority opinion.

## I. BACKGROUND

### A. Statutory Framework

The National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236, "imposes strict registration requirements on statutorily defined 'firearms.'" *Staples v. United States*, 511 U.S. 600, 602 (1994). In the 1934 legislation, the Congress defined "machinegun" as a specific type of "firearm." The original text defined a "machinegun" as "any weapon which shoots, or is designed to shoot, automatically *or semiautomatically*, more than one shot, without manual reloading, by a single function of the trigger." National Firearms Act § 1(b). A few decades later, the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, amended the definition in two key ways, deleting the phrase "or semiautomatically" and including "parts" designed and used to "convert a weapon into a machinegun."[2] Gun Control Act, tit. II, § 201, 82 Stat. at 1231 (codified at 26 U.S.C. § 5845(b)). The definition of "machinegun" in effect today includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

The Firearms Owners' Protection Act of 1986 (Act), Pub. L. No. 99-308, 100 Stat. 449, effectively banned private ownership of machine guns. Firearms Owners' Protection Act, § 102(9) (codified at 18 U.S.C. § 922(o)(1)). The Act makes it

---

[2] It thus extends to "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

"unlawful for any person to transfer or possess a machinegun," 18 U.S.C. § 922(o)(1)), and "machinegun" has "the meaning given . . . in section 5845(b) of the National Firearms Act," *id.* § 921(a)(3). A person who "knowingly" violates the ban can be "fined . . . [or] imprisoned not more than 10 years, or both." *Id.* § 924(a)(2). The ban has two exceptions: one for "a transfer to or by, or possession by or under the authority of" the federal government or a state government, *id.* § 922(o)(2)(A), and the other grandfathers any "machinegun" lawfully possessed before the Act went into effect, *id.* § 922(o)(2)(B).

## B. History of Bump Stock Regulation

Firearms manufacturers have created various devices that allow a lawful semiautomatic rifle to perform more rapidly. A bump stock is one such device. It replaces the standard stock of a rifle—the part that rests against the shooter's shoulder. A bump stock "free[s] the weapon to slide back and forth rapidly." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,516. The sliding motion allows a shooter to increase his rate of fire. A rifle produces recoil energy upon firing. The bump stock helps direct the firearm's recoil and convert the recoil energy into rapidly firing rounds. It works like this: the shooter pulls the trigger; the recoil causes the firearm to slide backward; the shooter maintains backward pressure on the trigger with the index finger of his shooting hand and forward pressure on the barrel with his other hand. *Id.* This process causes the firearm to slide back and forth rapidly, bumping the shooter's stationary trigger finger and thereby firing additional rounds. *Id.*

Some bump stock devices use only the shooter's physical pressure to channel the recoil energy and do not include springs or mechanical parts. *Id.* For these devices, a single pull of the trigger alone—without the shooter's additional forward

pressure—does not cause the firearm to shoot more than one round. Video evidence in the record makes this clear.[3] In the video, the shooter fires a rifle equipped with a non-mechanical bump stock. The shooter holds the rifle with one hand, the trigger hand. He then pulls the trigger and the rifle fires a single shot. Without his other hand's forward pressure on the barrel, the rifle equipped with a non-mechanical bump stock fires only a single round with each pull of the trigger.

The ATF first classified a bump stock type device in 2002, concluding that it was not a "machinegun." *Id.* at 66,517. The classification involved a product called the Akins Accelerator, a bump stock that used internal springs. "To operate the device, the shooter initiated an automatic firing sequence by pulling the trigger one time, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset." *Id.* "Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger, which caused the weapon to discharge the ammunition." *Id.* The ATF interpreted the statutory language "single function of the trigger" to mean a "single movement of the trigger." *Id.* A semi-automatic rifle fires only a single round each time the trigger is pulled and reset. According to the ATF, because the Akins Accelerator did not modify how a semiautomatic rifle's trigger "moves" with each shot, it was not a "machinegun."

In 2006, the ATF reclassified the Akins Accelerator as a "machinegun." It reinterpreted the phrase "single function of the trigger" from "single movement of the trigger" to "single pull of the trigger." *Id.* The reinterpretation made all the difference. Once a shooter pulls and maintains pressure on the trigger, the internal springs of the Akins Accelerator start an

---

[3] The declaration of Rick Vasquez, a former senior ATF Technical Expert, attests to the accuracy of the video evidence.

automatic sequence that keeps the rifle firing until the shooter removes his finger or depletes the ammunition. The firing of multiple rounds based on a single continuous pull of the trigger made the device a "machinegun" under the ATF's reinterpretation. The Akins Accelerator inventor challenged the ATF's changed reading in federal district court (M.D. Fla.), arguing that the Agency misinterpreted the statutory definition of "machinegun." The district court upheld the ATF's determination and the Eleventh Circuit affirmed. *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009). The appellate court concluded that "the interpretation by the Bureau that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the [National Firearms Act] and its legislative history." *Id.* at 200 (quoting 26 U.S.C. § 5845(b)).

"In ten letter rulings between 2008 and 2017, ATF applied the 'single pull of the trigger' interpretation to other bump-stock-type devices" and determined that none qualified as a "machinegun." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,517. Although each device fired more than one round with a single pull of the trigger, the ATF concluded that none was a "machinegun" because the firing sequence did not occur "automatically." Unlike the Akins Accelerator, the devices did not rely on springs or mechanical parts. In order to use them, "the shooter [had to] apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand." Joint Appendix (J.A.) at 278. Thus, the ATF drew a distinction between a bump stock with mechanical parts like springs that cause a more rapid firing sequence and a bump stock that uses both of the shooter's hands to do the same. *E.g.*, Letter from Richard W. Marianos, Assistant Dir. Pub. and Governmental Affairs, to Congressman Ed Perlmutter (April 16, 2013), *reprinted at* J.A. 281–82.

## C. The Bump Stock Rule

In October 2017, a gunman armed with several semiautomatic rifles killed 58 people and wounded 500 more in Las Vegas, Nevada. The rifles were equipped with bump stock devices, which "were readily available in the commercial marketplace through online sales directly from the manufacturer, and through multiple retailers." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,514. Using these devices, the gunman was able to fire hundreds of rounds in a matter of minutes. Within months, the ATF began to promulgate a regulation to classify any bump stock type device as a "machinegun." President Trump directed the DOJ to "dedicate all available resources to . . . propos[ing] for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 83 Fed. Reg. 7,949 (Feb. 20, 2018).

In December 2018, the ATF promulgated the Bump Stock Rule.[4] *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,514. It declares that all bump stock type devices "are 'machineguns' as defined by the National Firearms Act of 1934 and the Gun Control Act of 1968 because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger." *Id.* According to the Rule, the "devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation *of the trigger* by the shooter." *Id.* (emphasis

---

[4] The Rule amends three separate regulations, 27 C.F.R. §§ 447.11, 478.11, 479.11, reinterpreting with identical language the statutory definition of "machinegun" in each.

added). Thus, "a semiautomatic firearm to which a bump-stock device is attached is able to produce automatic fire with a single pull of the trigger." *Id.*

The Bump Stock Rule was scheduled to go into effect on March 26, 2019.[5]  There were then an estimated 280,000 to 520,000 previously legal bump stocks in circulation in the United States.  *See Bump-Stock-Type Devices,* 83 Fed. Reg. 13,442, 13,451 (March 29, 2018).  Under the Rule, "[b]ump-stock-type devices . . . possessed by individuals [had] to be destroyed or abandoned" before March 26.  *Bump-Stock-Type Devices* 83 Fed. Reg. at 66,546.  Anyone who possesses or transports the device after that date faces criminal liability.  18 U.S.C. § 922(o)(1).

## D.  Procedural History

The plaintiffs, five individual firearms owners and four non-profit organizations, challenge the Bump Stock Rule's legality on several grounds.  Their primary challenge is that the Rule misinterprets the statutory definition of "machinegun" and mistakenly extends that definition to cover bump stock type devices.  They also attack the Rule for alleged procedural gaps in the rulemaking process and for taking property without just compensation in violation of the Fifth Amendment's Due Process Clause.  Finally, the plaintiffs contend that former Acting Attorney General Matthew Whitaker was not properly appointed to his position and thus lacked authority to approve the Rule.  The plaintiffs separately moved for preliminary injunctive relief.

---

[5] After hearing argument on March 22, 2019, we issued an administrative order staying the Rule's effective date but only as to the plaintiffs. Per Curiam Order, *Guedes v. ATF*, No. 19-5042 (D.C. Cir. March 23, 2019).

8

The district court consolidated and denied the motions. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court determined that the Rule reasonably interprets "machinegun" to include bump stock devices. It also rejected the plaintiffs' other challenges either as unlikely to succeed on the merits or as unsuitable for equitable relief. Accordingly, the district court denied relief without reaching the other three preliminary-injunction factors. The plaintiffs then filed a timely interlocutory appeal. *See* 28 U.S.C. § 1292(a)(1).

## II. ANALYSIS

### A. STANDARD OF REVIEW

The district court's denial of preliminary injunctive relief rests on its legal determination that the Bump Stock Rule does not misinterpret or misapply the statutory definition of "machinegun." Our review is therefore *de novo*. *City of Las Vegas v. Lujan*, 891 F.2d 927, 931–32 (D.C. Cir. 1989) (*de novo* review of denial of preliminary injunctive relief where "district judge did not make any factual determinations . . . since he was sitting in appellate review of agency action" and "denied the preliminary injunction because, and only because, he believed the [agency] was likely to succeed on the merits"); *see also Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1178 (D.C. Cir. 1994) ("Upon the issue whether an administrative regulation is lawful, we do not defer to the judgment of the district court.").

Despite the parties' agreement that the *de novo* standard of review applies, my colleagues, like the district court, *see*

*Guedes*, 356 F. Supp. 3d at 126–27, nonetheless review the ATF's interpretation under the two-step framework set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).[6] But the United States Supreme Court has recently clarified whether the *Chevron* framework applies to a statute—and, by extension a rule— enforced by a criminal sanction. *United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."). In another recent decision, *Abramski v. United States*, the ATF had taken one view of 18 U.S.C. § 922(a)(6) for "almost two decades," concluding that a straw purchaser's "misrepresentation" counted as "material" under the statute notwithstanding the true buyer could legally possess a gun. 573 U.S. at 191. The defendant pointed out that the ATF had until 1995 taken the opposite position, requiring the true buyer to be ineligible to possess a gun in order to make the straw purchaser's misrepresentation "material." *Id.* The Supreme Court responded that the "ATF's old position [is] no more

---

[6] Even under *Chevron*, "[a]n agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003). Because the Bump Stock Rule exceeds the ATF's authority by veering from the plain meaning of the statute, I would reach the same conclusion whether *Chevron* step one or *de novo* review applies.

In reply to my colleagues' insistence that, at the rulemaking stage, the ATF emphasized its reliance on *Chevron*, Maj. Op. at 26–28, I would note that the ATF in fact declared that the Rule's interpretations of "single function of the trigger" and "automatically" "accord with the *plain meaning* of those terms." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,527 (emphasis added). Its "fallback" position at that stage was "*even if* those terms are ambiguous, this rule rests on a reasonable construction of them." *Id.* (emphasis added).

relevant than its current one—which is to say, not relevant at all." *Id.* Indeed, "[w]hether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to in construing § 922(a)(6)), a court has an obligation to correct its error." *Id.* In its *Apel* and *Abramski* decisions, then, "[t]he Supreme Court has expressly instructed us *not* to apply *Chevron* deference when an agency seeks to interpret a criminal statute." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1156 (10th Cir. 2016) (Gorsuch, J., concurring).

My colleagues believe that this case is different because the 26 U.S.C. § 5845(b) definition of "machinegun" has both civil[7] and criminal[8] enforcement implications. They reach their conclusion regarding the applicable standard of review based in part on a footnote in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995). That case involved a regulation interpreting the definition of "harm" under the Endangered Species Act, a regulation with both criminal and civil enforcement implications. *Id.* at 704 n.18.

---

[7] *See* 26 U.S.C. § 5872(a) ("Any firearm involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture, and (except as provided in subsection (b)) all the provisions of internal revenue laws relating to searches, seizures, and forfeitures of unstamped articles are extended to and made to apply to the articles taxed under this chapter, and the persons to whom this chapter applies.")

[8] *See* 18 U.S.C. § 922(o)(1) ("[I]t shall be unlawful for any person to transfer or possess a machinegun."); 18 U.S.C. § 921(a)(23) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).")); 18 U.S.C. § 924(a) (establishing penalties for "knowing[]" or "willful[]" violation of, *inter alia*, section 922(o)(1)'s ban on machinegun possession or transfer).

The Supreme Court deferred to the Secretary of the Interior's interpretation under *Chevron*. *Id.* at 703–04. The majority reads *Babbitt*—and some of our precedent—to establish a bright-line rule that any regulation with both civil and criminal enforcement provisions merits *Chevron* deference. Maj. Op. at 36–40; *see In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000); *United States v. Kanchanalak*, 192 F.3d 1037, 1047 n.17 (D.C. Cir. 1999).[9]

With respect, I am not convinced that my colleagues' reading of *Babbitt* as the last word on this topic is correct. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 n.8 (2001) (declining, post-*Babbitt*, to address relationship between *Chevron* and agency regulation interpreting statute with criminal sanction). The Supreme Court's most recent decisions indicate, as the ATF and the plaintiffs argue here, Government Br. 36–37; Codrea Opening Br. at 9–11, that *Chevron* review does not apply to a statute/rule with criminal sanctions.[10] *Apel*, 571 U.S. at 369; *Abramski*, 573 U.S. at 191. And if *Chevron* review does not apply to a

---

[9] One post-*Apel* and *Abramski* Circuit decision applies the *Chevron* framework to a regulation with criminal and civil enforcement provisions. *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 915 (D.C. Cir. 2017). But only one judge signed on to that view; one dissented and another wrote separately to explain that he would reach the same result under *de novo* review, which made *Chevron*'s applicability *vel non* unnecessary to his vote, *id.* at 921 (Kavanaugh, J., concurring).

[10] I leave for another day whether the Government can "waive" *Chevron* review, as my colleagues view the ATF's stance here. Maj. Op. at 32–36; *but see Glob. Tel*Link v. FCC*, 866 F.3d 397, 417 (D.C. Cir. 2017) ("it would make no sense for this court to determine whether" agency action "warrant[s] *Chevron* deference" if the agency "no longer seeks deference"). I view the ATF's stance to be that *Chevron* is inapplicable—period. Government Br. 36–37.

statute/rule with criminal sanctions, *Chevron* cannot apply to a statute/rule with *both* criminal *and* civil sanctions. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005) (a statute can have only a single meaning and "[t]he lowest common denominator, as it were, must govern"); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[W]e must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context."). Again, with respect, the majority may misread *Babbitt*, which itself includes language that can allow its holding to be reconciled with recent Supreme Court decisions:

> We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement. Even if there exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity, the "harm" regulation, which has existed for two decades and gives a fair warning of its consequences, cannot be one of them.

515 U.S. at 704 n.18. Footnote 18 suggests, I submit, that a regulation with a criminal sanction *can* violate the rule of lenity but concluded that the regulation at issue, with its longstanding definition of "harm," did not do so. *Id.* My reading allows *Babbitt* to be harmonized with more recent decisions: *Chevron* does not apply to a regulation enforced both civilly and criminally unless the regulation gives fair warning sufficient to avoid posing a rule of lenity problem. The ATF's interpretation of "machinegun" gives anything but fair warning—instead, it does a *volte-face* of its almost eleven years' treatment of a non-mechanical bump stock as not constituting a "machinegun."

13

Although I do not dispute that the ATF has been delegated general rulemaking authority to implement section 5845(b), *inter alia*, I am less certain than my colleagues that we owe deference to the ATF's interpretation of section 5845(b). "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). Statutory ambiguity, if it exists, does not necessarily constitute an implicit delegation. *King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015); *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419–24 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). The Congress must, for instance, "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks omitted). There is good reason to believe that a similar clear-statement rule applies in the criminal law context. Under longstanding separation-of-powers principles, the Congress defines the criminal law and must speak distinctly to delegate its responsibility.[11] *United States v. Bass*, 404 U.S. 336, 348 (1971); *United States v. Grimaud*, 220 U.S. 506, 519, 522 (1911); *United States v. Eaton*, 144 U.S. 677, 688 (1892). Unlike with civil statutes, then, ambiguity in the criminal law is presumptively for the Congress—not the ATF—to resolve. *Whitman v. United States*, 135 S. Ct. 352, 354 (2014) (Scalia, J., statement respecting denial of certiorari) ("Congress cannot, through ambiguity, effectively leave that function to the courts—much less to the administrative bureaucracy.").

---

[11] The Supreme Court has upheld executive branch interpretations of the criminal law based on *express* delegations of interpretive authority. *See United States v. O'Hagan*, 521 U.S. 642, 667 (1997) (Securities Exchange Act of 1934); *Touby v. United States*, 500 U.S. 160, 165–69 (1991) (Controlled Substances Act).

Accordingly, I would treat an ambiguous criminal statute to be of "vast economic and political significance" and apply *Chevron* only if the Congress expressly delegates its lawmaking responsibility. *See Util. Air Regulatory Grp.*, 573 U.S. at 324. The Congress has made no such clear statement; instead the ATF relies solely on its general rulemaking power and statutory ambiguity. 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). *Chevron* is inapplicable. *See King*, 135 S. Ct. at 2489.

I believe the applicable standard of review is *de novo* and therefore we should go "the old-fashioned" route and "decide for ourselves the best reading" of "machinegun." *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (quoting *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001)). As is always the case in construing a statute, the inquiry focuses on "the plain meaning of the text, looking to the 'language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Blackman v. District of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (quoting *United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002)). The Bump Stock Rule declares that any bump stock device qualifies as a "machinegun." Although the Rule—in my view—correctly interprets "single function of the trigger," it misreads "automatically." Moreover, it misapplies its interpretation of "single function of the trigger" to bump stock type devices.

## B. "Single Function of the Trigger"

The Rule determines that "single function of the trigger" within the statutory definition of "machinegun" means "single pull of the trigger and analogous motions." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,554. To me, the "function" of the trigger means "action" of the trigger. Webster's New

International Dictionary 1019 (2d ed. 1934). According to the section 5845(b) definition, the trigger function "shoots" the firearm. 26 U.S.C. § 5845(b) ("The term 'machinegun' means any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger."); *see also Fortier v. Olin Corp.*, 840 F.2d 98, 101 (1st Cir. 1988) (discussing mechanics of lever-action rifle). "Pull of the trigger," then, describes *how* the trigger works. *See Staples*, 511 U.S. at 602 n.1; *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (using trigger "pull" and "function" interchangeably); *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (same). The Rule recognizes that not all firearms feature a pull trigger; some involve "fire initiated by voice command, electronic switch, swipe on a touchscreen or pad, or any conceivable number of interfaces." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,534; *see also United States v. Fleischli*, 305 F.3d 643, 655–56 (7th Cir. 2002) (minigun fired by "electronic switch" is machinegun). To include these non-pull methods used to shoot a firearm, the Rule includes the phrase "and analogous motions." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,553.

The plaintiffs claim that the Rule's interpretation of "single function" impermissibly shifts the *statutory* focus from the *trigger*'s action to the *trigger finger*'s action. But the Rule defines "single function" to mean "single pull of the trigger and analogous motions." The Rule's definition describes the "motion" of the trigger, not of the trigger finger. *Id.* at 66,554. Indeed, nothing in the Rule's definition refers to a shooter's finger or a volitional action. *Id.* The plaintiffs challenge the Rule because the ATF determines therein that a bump stock device allows the firearm to shoot more than one shot with only a single pull. But that is a question of application, not definition. As for the definition, I believe the Rule correctly

reads "function" by focusing on how the trigger acts—that is, through a pull.

## C. "Automatically"

The Bump Stock Rule defines "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66,519. The plaintiffs challenge this definition because it does not account for the additional physical input the shooter must provide in the firing sequence to make a firearm with a bump stock shoot more rapidly. That "pull plus" action, they say, invalidly expands the statutory text: a "'single function of the trigger' is the starting and the ending point of [making] a firearm automatic." Codrea Br. at 14. I agree.[12]

The Rule's fatal flaw comes from its "adding to" the statutory language in a way that is—at least to me—plainly *ultra vires*. 1A Sutherland Statutory Construction § 31.02, at 521 (4th ed. 1985) ("The legislative act is the charter of the administrative agency and administrative action beyond the authority conferred by the statute is ultra vires."); *see Burnet v. Marston*, 57 F.2d 611, 612 (D.C. Cir. 1932) ("While the [agency] was clothed with authority to promulgate regulations, [it] was not authorized to add to or take from the plain language

---

[12] A portion of the Bump Stock Rule's definition of "automatically" strikes me as unobjectionable. It adopts the phrase "functioning as the result of a self-acting or self-regulating mechanism" as a substitute for "automatically." *Bump-Stock-Type Devices*, 83 Fed Reg. at 66,554. It does so because dictionaries in use at the time the 1934 Act was enacted defined "automatically" that way. *Id.* at 66,519; *see also* Webster's New International Dictionary 187 (2d ed. 1934) ("automatic" means "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation").

of the statute, for, 'where the intent is plain, nothing is left to construction.'" (quoting *United States v. Fisher*, 6 U.S. 358, 386 (1805))). "Automatically" cannot be read in isolation. On the contrary, it is modified—that is, limited—by the clause "by a single function of the trigger." 26 U.S.C. § 5845(b); Webster's New International Dictionary 307 (2d ed. 1934) (defining "by" as "through the means of"). Section 5845(b)'s awkward syntax does not equal ambiguity, as illustrated by the lost art of diagramming.[13] "Automatically . . . by a single function of the trigger" is the sum total of the *action necessary* to constitute a firearm a "machinegun." 26 U.S.C. § 5845(b). A "machinegun," then, is a firearm that shoots more than one round by a single trigger pull without manual reloading.[14] The

---

[13] Section 5845(b) can be diagrammed as follows:



*See generally* Marye Hefty et al., *Sentence Diagramming* 7–11, 17–20, 24–25, 30–31, 33, 49 (2008).

[14] In *United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009), the Seventh Circuit discussed the meaning of "machinegun." It explained that "'automatically' is the adverbial form of 'automatic,'" meaning "[h]aving a self-acting or self-regulating mechanism." *Id.* at 658 (alteration in original) (quoting Webster's New International Dictionary 187 (2d ed. 1934)). It then read section 5845(b)'s "automatically" as follows: "the adverb 'automatically,' as it modifies the verb 'shoots,' delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting

statutory definition of "machinegun" does not include a firearm that shoots more than one round "automatically" by a single pull of the trigger **AND THEN SOME** (that is, by "constant forward pressure with the non-trigger hand"). *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,532. By including more action than a single trigger pull, the Rule invalidly expands section 5845(b), as the ATF itself recognized in the rulemaking. *See id.* (shooter "maintain[s] constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle," *and* "maintain[s] the trigger finger on the device's extension ledge with constant rearward pressure.").

My reading of the statute comports with the common sense meaning of the language used. Suppose an advertisement declares that a device performs a task "automatically by a push of a button." I would understand the phrase to mean pushing the button activates whatever function the device performs. It would come as a surprise, I submit, if the device does not operate until the button is pushed *and* some other action is taken—a pedal pressed, a dial turned and so on. Although the device might be "automatic" under some definition, it would not fit the advertised definition of "automatic": by a push of a button period.

More importantly, my reading of the statute—unlike the ATF's reading—maintains the longstanding distinction between "automatic" and "semiautomatic" in the firearms context. The original definition of "machinegun" in the 1934 Act included a firearm that shoots more than one round

---

mechanism." *Id.* My rejection of the Bump Stock Rule creates no tension with *Olofson*. That court did not consider whether additional manual input from the non-shooting hand—"pull plus"—takes a device outside section 5845(b)'s definition of "automatically." Nor did *Olofson* consider whether "pull" refers to how the trigger works or to the movement of the shooter's trigger finger.

"automatically or semiautomatically." 26 U.S.C. § 2733(b) (1940). At the time, an "automatic gun" was understood to be "[a] firearm which, after the first round is exploded, by gas pressure or force of recoil automatically extracts and ejects the empty case, loads another round into the chamber, fires, and repeats the above cycle, until the ammunition in the feeding mechanism is exhausted, or pressure on the trigger is released." Webster's New International Dictionary 187 (2d ed. 1934). A "semiautomatic gun" was (and is) "[a] firearm in which part, but not all, of the operations involved in loading and firing are performed automatically, as when the recoil is used to open the breech and thus prepare for reloading by hand." Webster's New International Dictionary 187 (2d ed. 1934). At the time of the 1934 Act's enactment, then, the difference between an "automatic" and a "semiautomatic" gun depended on whether the shooter played a manual role in the loading and firing process. My interpretation fits the historical context by limiting "automatic[]" to a firearm that shoots more than one round by a single trigger pull with no additional action by the shooter. By contrast, the Bump Stock Rule reinterprets "automatically" to mean what "semiautomatically" did in 1934—a pull of the trigger *plus*. The Congress deleted "semiautomatically" from the statute in 1968 and the ATF is without authority to resurrect it by regulation.

The ATF insists that my interpretation renders "automatically" superfluous—a result inconsistent with the well-established principle that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (alteration in original) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Not even close. "[A]utomatically" means that the firearm shoots more than one shot as the result of a self-acting mechanism effected by a single pull of the trigger. Thus, the

combination of "automatically" and "by a single pull" explains *how* the shooter accomplishes the firing sequence of a "machinegun." Under my reading, "automatically" *excludes* a "machinegun" that uses a self-acting firing sequence effected by action in addition to a single pull of the trigger.

Finally, the ATF, as well as the district court, posits that the Bump Stock Rule meets one ordinary meaning of "automatically"—that is, "perform[s] parts of the work formerly or usually done by hand." Webster's New International Dictionary 187 (2d ed. 1934). Both believe that a bump stock "makes it easier to bump fire because it controls the distance the firearm recoils and ensures that the firearm moves linearly—two tasks the shooter would ordinarily have to perform manually." *Guedes*, 356 F. Supp. 3d at 132. Maybe so. But the Rule does not use the "formerly done by hand" meaning of "automatically." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,519. It defines "automatically" to mean "as the result of a self-acting or self-regulating mechanism." *Id.* Whether *that* definition is consistent with section 5845(b)'s definition is the question before us.[15]

## D. Is a Bump Stock a "Machinegun?"

Having interpreted "automatically" and "single function of the trigger," the Rule declares that a "'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull

---

[15] I am not quibbling about semantics. The two definitions of "automatically" have different aims: one refers to a self-acting object; the other refers to automating a formerly "by-hand" task. Webster's Third New International Dictionary 148 (1993). The "formerly by-hand" definition would shift the focus from whether a bump stock provides a self-acting mechanism to fire multiple rounds to whether a bump stock automates any action in the firing sequence.

of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66,553–54. There are at least two defects in this classification. It ignores the fact that a non-mechanical bump stock—a type of bump stock device covered by the Rule—does not allow the firearm to shoot more rapidly with a single pull of the trigger because the shooter must provide "constant forward pressure with the non-trigger hand" for the device to function. *Id.* at 66,532. It also erroneously determines that a bump stock allows a semiautomatic rifle to fire more than one round with a single pull of the trigger. For these reasons, I agree with the plaintiffs that a bump stock is not a "machinegun."

*First*, a firearm equipped with a non-mechanical bump stock does not fire "automatically" because the shooter must also provide constant forward pressure with his non-shooting hand. The Rule's very description of a non-mechanical bump stock manifests that its proscription is *ultra vires*:

> [Bump stock] devices replace a rifle's standard stock and free the weapon to slide back and forth rapidly, harnessing the energy from the firearm's recoil either through a mechanism like an internal spring or *in conjunction with the shooter's maintenance of pressure* (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, *and* constant rearward pressure on the device's extension ledge with the shooter's trigger finger).

*Id.* at 66,516 (emphases added). This description covers two types of bump stocks, one that includes a mechanism like an

internal spring and the other that requires the shooter to maintain pressure with his non-trigger hand. *Id.* The first type, including the original Akins Accelerator, has been classified as a "machinegun" and hence illegal since 2006. *Id.* at 66,517. The Rule must—and does—aim at the second type—the non-mechanical bump stock—which operates only in conjunction with the shooter's added physical pressure.[16] But that added physical pressure is inconsistent with the statutory definition of a "machinegun," which fires multiple rounds with a self-acting mechanism effected through a single pull of the trigger *simpliciter*. In short, the statute uses "pull" and the Rule— invalidly—uses "pull *plus*."

Other parts of the Rule expose the ATF's error. In discussing its interpretation of "automatically," the ATF gave the following explanation: "[s]o long as the firearm is capable of producing multiple rounds with a single pull of the trigger until [1] the trigger finger is removed, [2] the ammunition supply is exhausted, or [3] the firearm malfunctions, the firearm shoots 'automatically' irrespective of why the firing sequence ultimately ends." *Id.* at 66,519. Yet elsewhere the ATF describes the firing process of a firearm with a bump stock as follows: "the shooter 'pulls' the trigger once and allows the firearm and attached bump-stock-type device to operate until the shooter releases the trigger finger *or* the constant forward pressure with the non-trigger hand." *Id.* at 66,532 (emphasis added). In my view, this assertion is an explicit recognition that a bump stock device *does not* continue shooting rounds with a single trigger pull if the shooter does not maintain

---

[16] At oral argument, the ATF asserted that the non-trigger hand's "additional forward pressure" is part of the "automatic" firing process. Transcript of Oral Argument 73–74. "Automatic" means "self-acting or self-regulating." *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,553. The non-trigger hand's constant forward pressure requires physical, not automatic, action.

"constant forward pressure with the non-trigger hand."  *Id.* at 66,532.

Moreover, I find it difficult to ignore the ATF's repeated earlier determinations that non-mechanical bump stocks do not initiate an automatic firing sequence.    Three ATF determination letters from 2010 to 2013 explained why non-mechanical bump stocks are not "machineguns":

> [Our] evaluation confirmed that the submitted stock (see enclosed photos) does attach to the rear of an AR-15 type rifle which has been fitted with a sliding shoulder-stock type buffer-tube assembly.   The stock has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed.   In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand.

Determination Letter signed by John R. Spencer, Chief, Firearms Tech. Branch, ATF (June 7, 2010), *reprinted at* J.A. 278; *see also* Determination Letter signed by John R. Spencer, Chief, Firearms Tech. Branch, ATF (April 2, 2012), *reprinted at* J.A. at 279–80; Letter from Richard W. Marianos, Assistant Dir. Pub. and Governmental Affairs, to Congressman Ed Perlmutter (April 16, 2013), *reprinted at* J.A. 281–82.   The Rule does not fairly treat the ATF's repeated determinations that a non-mechanical bump stock "performs no automatic mechanical function when installed."  J.A. 278.   Instead, it rejects its previous reading as based on an incomplete *legal* definition of "automatically."  *Bump-Stock-Type Devices*, 83

24

Fed. Reg. at 66,521.[17]  But those determinations made *factual findings* that the non-mechanical bump stock operates only if the shooter applies "constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand."  Determination Letter signed by John R. Spencer, Chief, Firearms Tech. Branch, ATF (June 7, 2010).  And those factual findings dictate that a non-mechanical bump stock is not a "machinegun" under section 5845(b).

*Second*, a semiautomatic rifle equipped with a bump stock *cannot* fire more than one round with a *single* function of the trigger.  The plaintiffs argue—and the ATF does not dispute—that the trigger of a semiautomatic rifle must release the hammer for each individual discharge.  Nor is there any dispute that a semiautomatic rifle cannot fire again until the trigger is released, which causes the hammer to reset.  The Rule refers to the release of the trigger as a "separate" function.  *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,534 ("While semiautomatic firearms [equipped with certain devices] may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired.  Even if this release results in a second shot being fired, it is as the result of a separate function of the trigger.").  Once the trigger shoots, it must be released to reset the hammer and the trigger must be pulled again for each subsequent shot.  Verified Declaration of Richard (Rick)

---

[17]  During the rulemaking, the ATF repeatedly declared that its earlier determinations "did not include extensive legal analysis of the statutory terms 'automatically' or 'single function of the trigger.'"  *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,516; *see also id.* at 66,514, 66,521, 66,528, 66,531.  I defy a careful reader of the rulemaking to find *any* legal, as opposed to functional, analysis of a bump stock device, much less substantial legal analysis.  *Id.* at 66,518 ("[P]rior ATF rulings concerning bump-stock-type devices did not provide substantial or consistent legal analysis regarding the meaning of the term 'automatically.'").

Vasquez, former Acting Chief of the Firearms Tech. Branch of ATF, at 4 (with bump stock, "after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged"), *reprinted at* J.A. 275. Thus, a semiautomatic rifle equipped with a bump stock cannot shoot more than one round with a single pull of the trigger.[18]

Still, the ATF insists that a bump stock allows a firearm to shoot multiple shots with a single pull. *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,553–54. The ATF focuses on whether the shooter must pull his index finger more than once to fire multiple shots. Because a bump stock allows the firearm to fire more than once with a single pull of the index finger, the ATF concludes that a bump stock is a "machinegun." Remember, however, section 5845(b) uses "single function of the trigger," not single function of the shooter's trigger finger.

If the focus is—as it must be—on the trigger, a bump stock does not qualify as a "machinegun." A semiautomatic rifle shoots a single round per pull of the trigger and the bump stock changes only *how* the pull is accomplished. Without a bump stock, the shooter pulls the trigger with his finger for each shot. With a bump stock, however, the shooter—after the initial pull—maintains backward pressure on the trigger and puts

---

[18] Record evidence supports my point. As discussed earlier, the record includes a video of a shooter firing a rifle equipped with a bump stock. The video is in slow motion and focuses on the trigger. For each shot the rifle fires, the trigger is pulled by the shooter's stationary trigger finger. The trigger is then released between each shot. And the trigger is pulled again for the next shot. This trigger movement confirms that a bump stock does not allow a rifle to shoot more than one round with *only* a single pull of the trigger. Attached as an appendix are photographs, taken from the video, that illustrate the trigger's movement during the bump stock's firing sequence.

forward pressure on the barrel with his non-shooting hand; these manual inputs cause the rifle to slide and result in the shooter's *stationary* finger pulling the trigger. *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,533 ("The constant forward pressure with the non-trigger hand pushes the firearm forward, again pulling the firearm forward, engaging the trigger, and firing a second round."). The bump stock therefore affects whether the shooter *pulls* his trigger finger or keeps it *stationary*. It does not change the movement of the trigger itself, which "must be released, reset, and fully pulled rearward before [a] subsequent round can be fired." Verified Declaration of Richard (Rick) Vasquez, former Acting Chief of the Firearms Tech. Branch of ATF, at 3–4.

Like countless other Americans, I can think of little legitimate use for a bump stock. That thought, however, has nothing to do with the legality of the Bump Stock Rule. For the reasons detailed *supra*, I believe the Bump Stock Rule expands the statutory definition of "machinegun" and is therefore *ultra vires*. In my view, the plaintiffs are likely to succeed on the merits of their challenge and I would grant them preliminary injunctive relief.

Accordingly, I respectfully dissent.

### <u>APPENDIX</u>

**Photograph One:** Trigger separates from stationary index finger.



**Photograph Two:** Trigger comes into contact with stationary index finger.

